NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
KENNETH ZAHL, M.D.,            )
                               )
          Plaintiff,           )
                               )        Civil Action No.: 06-3749 (JLL)
     v.                        )
                               )        **OPINION**
NEW JERSEY DEPARTMENT OF )
LAW AND PUBLIC SAFETY,         )
et. al.,                       )
                               )
          Defendants.          )
_____)

**LINARES**, District Judge.

This matter comes before the Court by way of the motion on behalf of Defendants the

State of New Jersey, the New Jersey State Board of Medical Examiners, Stuart Rabner (now

Chief Justice Rabner), Douglas J. Harper, and Paul R. Kenny (collectively, the "State

Defendants") to dismiss the Amended Verified Complaint ("Amended Complaint") filed June

29, 2007; Defendant Philip Rubinfeld's ("Rubinfeld") motion to dismiss filed July 16, 2007;[1]

and Harry Kosovsky's, Gertrude Kosovsky's, and Karen Ann Kosovsky's ("the Kosovsky

Defendants") motion to dismiss filed September 21, 2007.  For the reasons set forth in this

Opinion, the motions to dismiss of Defendants are denied in part and granted in part.

_____

[1]Rubinfield placed an additional motion to dismiss on the docket July 24, 2007, but this filing appears not to be a separate motion, but an attempt to insure that all of the July 16 documents appeared on the docket.  This Court will, therefore, treat Rubinfield as having filed only one motion to dismiss.

## INTRODUCTION

In order to facilitate an understanding of the facts underlying the present motion, the Court will briefly summarize the facts underlying Plaintiff Kenneth Zahl, M.D.'s ("Zahl" or "Plaintiff") voluminous Amended Complaint.  As the posture of the present motions make Zahl the nonmoving party, the facts will be examined in the light most favorable to him, though not, as he appears to prefer, in the idiom of Sergio Leone.[2]  Allegheny Gen. Hosp. v. Philip Morris, Inc., 228 F.3d 429, 434-35 (3d Cir. 2000); Am. Compl. at 10.

### A.    Zahl's Medical Practice and Medicare Billing Issue

Zahl is a medical doctor residing in New Jersey, specializing in anesthesiology, at one time licensed to practice in New Jersey, New York, and Pennsylvania.  (Am. Compl. at 6.)  From 1993 until 2006, Zahl practiced medicine in New Jersey in entities named Ambulatory Anesthesia of New Jersey, P.C. ("AANJ") and Kenneth Zahl, M.D., P.C. ("KZMDPC")  (Id. at 6-7.)  The New Jersey State Board of Medical Examiners (the "Board") revoked his license to practice medicine in New Jersey on May 10, 2006.  (Id. at 7.)  Zahl claims to have an exemplary record in his profession.  (Id. at 10.)

Zahl's practice appears to have revolved around "walk-in" surgery reimbursed by Medicare.  (Id. at 11.)  In his role as anesthesiologist, Zahl commonly performed a procedure called an "eye block" in preparing patients for surgery by another physician.  (Id. at 11-12.)  The compartmentalized nature of Zahl's position as anesthesiologist, however, created certain dilemmas:

---

[2]Zahl's Amended Complaint frames its pleadings under point headings adapted from the title of a well-known Western.  Am Compl. at 10; The Good, The Bad, and the Ugly (United Artists 1967) (directed by Sergio Leone).

> Once Ridgdale became more efficient in turning its OR over, and
> to cut down on patient fasting and waiting times, the decision was
> made to block the next patient just when the intraocular lens was
> inserted into the preceding patient, which would create an overlap
> of about fifteen minutes.  Concerned about over-lapping [sic] time
> based reporting and being a solo practitioner, Dr. Zahl began
> billing by the nerve block only in a CPT code that did not require
> any time, as at that time there was no mechanism for reporting
> discontinuous time periods to Medicare, as anesthesia time was
> defined as beginning when the anesthesiologist "first began to take
> care of the patient" and ended when no longer in personal
> ttendance in the PACU.

(Id. at 13.)  Medicare at first disagreed with Zahl's billing methodology in January 1995, came to

agree with Zahl's billing technique by (at latest) January 7, 1997, but rejected his bills as

improper through December of 1997.  (Id. at 13-14.)  The Federal contractor responsible for

Medicare claims in New Jersey audited Zahl's billing records, and, unsurprisingly given Zahl's

policy of overlapping patient care, found that his billing records contained overlaps.  (Id. at 14-

15.)  Additional audits, negotiations, and administrative procedures occurred in the Medicare

system, until on June 4, 2001, Zahl was found to have overbilled Medicare $1969.04,[3] and that

he was not without fault in doing so.  (Id. at 14-16.)  An ALJ affirmed the administrative finding.

(Id. at 19.)

**B.      Initial Revocation of Zahl's Medical License in State Proceedings**

A complaint by a fellow physician, Defendant Bonnie Blackman, M.D. ("Blackman") to

the Board on January 25, 1998, initiated an investigation of Zahl's billing practices.  (Id. at 20.)

---

[3]While the Amended Complaint contains several dollar values that relate to the Medicare
overbilling, the Court has elected to use the smallest value apparent in Zahl's pleadings given the
posture of the present motion.  The Court takes no position on the actual total of any Medicare
overbilling.

The New Jersey Attorney General filed a complaint before the Board on August 5, 1999, seeking to revoke Zahl's license to practice medicine in New Jersey. (Id. (hereinafter "Zahl I").) After the Board initially denied summary judgment to the state, an Administrative Law Judge ("ALJ") designated to hear the case granted summary judgment to the Attorney General on August 27, 2001. (Id. at 20-21.) The ALJ revoked Zahl's license to practice medicine in New Jersey on December 9, 2002. (Id. at 23.) The Board affirmed the ALJ's revocation of Zahl's license and ordered Zahl to pay $232,694.36 in costs on April 9, 2003. (Id.)

Zahl appealed the decision of the Board to the Appellate Division of the Superior Court of New Jersey, and on June 9, 2005, the Appellate Division upheld the Board's decision to discipline Zahl, but vacated the penalty of revocation of Zahl's license. (Id. at 24.) The New Jersey Supreme Court reversed the Appellate Division and upheld the original sanction applied by the Board on April 26, 2006. (Id. at 25.)

During these proceedings, Zahl claims that Defendant Douglas J. Harper ("Harper"), a prosecutor in the New Jersey Attorney General's office, violated various rights Zahl possessed under the United States Constitution with the following acts: withholding "exculpatory" information from all of the tribunals involved, bringing false charges for insurance fraud and improper record keeping, permitting Blackman to access Zahl's patient records, engaging in ex parte communications with the Director of the Medicare Fair Hearing Office and an ALJ, erroneously inflating the amount to be paid by Zahl in hearing costs upon losing his case before the Board, and mischaracterizing Zahl's conduct as "Medicare fraud." (Id. at 35-40.) Zahl alleges that he lost numerous professional (and pecuniary) opportunities as a result of Harper's conduct. (Id. at 40.)

-4-

**C.** **Zahl's Board Monitoring Pending His Appeal**

On his appeal to the Appellate Division of the Board's revocation of his license, Zahl

succeeded in obtaining a stay of the revocation from the court on April 11, 2003.  (Id. at 23-24.)

On May 5, 2003, the Board imposed a billing monitoring requirement on Zahl, ordering "in

essence that if he were to bill for any medical activities such activities must first be witnessed by

a medical board approved Nurse Practice Monitor who would log the activity."  (Id. at 26.)  A

Billing Monitor was also imposed.  (Id.)

Patricia Boeglin, R.N. ("Boeglin"), was the first Practice Monitor to work with Zahl.  (Id.

at 27.)  She submitted her first report to the Board, and apparently to a former prosecutor in the

Attorney General's office working on the appellate case, on September 15, 2003, finding no

violations by Zahl.  Subsequent to this first report, and after disclosing her contact with the

prosecutor to Zahl, Boeglin's relationship with Zahl became strained.  (Id. at 28.)  At some point

after the Zahl/Boeglin working relationship deteriorated, the Billing Monitor assigned to Zahl,

Patricia Ross, R.N. ("Ross"), found that all of Zahl's coding for his procedures was incorrect.

(Id. at 29.)  The Attorney General's office filed a complaint in March 2004 seeking to shut down

Zahl's practice, but agreed on May 11, 2004, to allow Zahl to continue to practice with new

Practice and Billing Monitors.  (Id. at 29-30.)

Prior to oral argument before the New Jersey Supreme Court in the appeal of the

disciplinary action of the Board, on January 26, 2006, the Attorney General's office filed a new

complaint with the Board seeking to close Zahl's practice for failure to comply with the Board-

imposed monitoring program.  (Id. at 30. (hereinafter "Zahl II")).  After hearings on February 8,

22, and 23 of 2006, the Board suspended Zahl's license.  (Id. at 30-31.)  Defendant Paul R.

Kenny ("Kenny"), the prosecutor representing the Attorney General of New Jersey in the monitoring case, died at some point thereafter.[4]  (Id. at 31.)

## D.     The Alleged Racketeer-Influenced Corrupt Organization

Zahl alleges that certain defendants were part of a "conspiratorial scheme to *extortionately* and *fraudulently* interfere with, deprive and obtain through wrongful means Dr. Zahl's right to practice medicine and conduct his business . . . calculated to ultimately drive Dr. Zahl out of business and out of the country to the Dominican Republic."  (Id. at 46 (emphasis in original).)  The scheme alleged by Zahl concerned interfering with and gaining control over his medical practice and business interests by the Kosovskys, Blackman, Rubinfeld, Kevin McKeown ("McKeown"), Mary Sue Brittle ("Brittle"), and Harper.  (Id. at 46-47.)

### 1.     The Zahl/Kosovsky Divorce

At some point prior to 1993, Zahl married Karen Kosovsky, the daughter of Harry and Gertrude Kosovsky.  (Id. at 58.)  Zahl and Karen Kosovsky separated in June 1993, and entered into divorce proceedings later that year.  (Id.)  The subsequent divorce and custody proceedings were contentious, involving allegations that Zahl posed a danger to his daughter and the hiring of McKeown as a private detective by the Kosovskys.  (Id. at 59-60.)  Zahl alleges that McKeown approached the Morris County, New Jersey, prosecutor's office with documents placed under seal in the New York divorce/custody action in order to have the prosecutor revoke Zahl's firearm permit and seize his firearms.  (Id. at 60-61.)  Zahl eventually succeeded, however, in retaining his firearms and permit.  (Id. at 61-62.)

---

[4]Zahl sues Kenny only in his official capacity.

### 2.      Blackman

While the custody proceedings were ongoing, Zahl hired Blackman, a former

acquaintance of Karen Kosovsky, as a physician under him on March 19, 1996.  (Id. at 63.)

Blackman's contract made her eligible to become a partner with Zahl in his practice if she met

certain criteria.  (Id.)  Zahl's practice at the time consisted largely of work conducted under a

contract with Ridgedale Surgery Center ("Ridgedale"), and Blackman assisted Zahl with

handling the work under that contract.  (Id.)  Blackman, according to Zahl, "solemnly promised,

agreed and vowed she would never talk to and become involved with Defendant Karen Kosovsky

if she were hired by Dr. Zahl."  (Id. at 64.)

Zahl claims that McKeown contacted Blackman in the "summer of 1997" to interfere

with her performance at Zahl's practice.  (Id. at 63.)  The "scheme" Zahl alleges that existed

between McKeown, Blackman, and the Kosovskys called for Blackman to become a partner with

Zahl, accuse him of improprieties, and take over his practice.  (Id. at 63-65.)  After Zahl informed

Blackman "in late summer of 1997" that she would most likely not be made a partner in the Zahl

practice, Blackman "alternatively fraudulently and extortionately schemed to obtain Dr. Zahl's

medical practice and business by directly contacting Ridgedale" in order to compete in the 1998

renewal of Zahl's exclusive contract with Ridgedale.  (Id. at 64-65.)  On December 19, 1997,

Zahl sent Blackman a letter stating that she would not be considered for partnership, but that she

could continue to work sans contract on a per diem basis.  (Id. at 66.)

### 3.      Rubinfeld

Also during the "summer of 1997," Rubinfeld contacted Zahl about receiving

employment with Zahl's practice, and Zahl informed Rubinfeld that there was no room in his

practice at the current time, but that space might become available if Blackman did not renew her contract.  (Id. at 65.)  Rubinfeld then "alternatively fraudulently schemed to obtain Dr. Zahl's medical practice and business by directly contacting Ridgedale in the summer of 1997 to attempt to secure Dr. Zahl's medical practice and business with Ridgedale for himself," including sending negative information from Zahl's divorce proceedings to a Dr. Liva (presumably related to Ridgedale).  (Id. at 65-66.)

### 4.      The Unwinding of the Zahl-Ridgedale Relationship

"During the Christmas break of 1997," Blackman accused the Zahl of engaging in "improper billing practices" to the Vice-President of Ridgedale.  (Id. at 66.)  On January 14, 1998, Blackman's attorney faxed Zahl a letter stating that Blackman wished to set aside her restrictive covenant with Zahl based on inappropriate entries in medical records.  (Id. at 67.)  Blackman apparently engaged in further contact with Ridgedale during January 1998, and on January 25, filed a complaint with the Board concerning Zahl's record keeping practices.  (Id. at 68.)  Blackman also filed complaints in New Jersey state court and with the federal contractor handling Medicare claims in New Jersey.  (Id.)

Ridgedale refused to renew Zahl's contract "[o]n or about February 1, 1998," and awarded the ensuing service contract to Rubinfeld.  (Id. at 69, 72.)

### 5.      Subsequent Proceedings in the Divorce and the Board Investigation

Contemporaneously with the end of the Ridgedale/Zahl contract, the Kosovsky's attorney indicated to a judge that Blackman would be a witness in the divorce case in January, 1998.  (Id. at 68-69.)  Blackman then met with "state investigators" Peterson and Melchionda at her attorney's office between February 23 and February 25, 1998, to discuss Zahl's medical practice,

during which she also mentioned an "anonymous male investogator" who had information concerning Zahl. (Id. at 69.) McKeown then contacted Melchionda and revealed that he was a private investigator working for the Kosovskys. (Id. at 70.) Zahl contends that McKeown communicated with the state investigators concerning a fictitious restraining order against Zahl, violent behavior by Zahl, psychiatric treatment of Zahl, and the gun permit allegations mentioned supra. (Id. at 71-72.)

The state investigators learned of discrepancies in Blackman's allegations against Zahl for medical record improprieties by May 21, 1998, after reviewing Ridgedale's records. (Id. at 72-73.) On June 14, 1998, anonymous parties, whom Zahl alleges to be McKeown and the Kosovskys, notified the state investigators by fax that Brittle had information related to Zahl's billing practices. (Id. at 73.) In August, 1998, Harper was assigned to oversee the investigation of Zahl, and Harper filed a complaint (Zahl I) concerning Zahl's billing practices on August 14, 1999.[5] (Id. at 73.)

Over the year that he oversaw the investigation prior to filing the complaint, Zahl alleges that Harper "joined the Kosovsky Defendants, Defendant McKeown, Defendant Blackman, Defendant Rubinfeld and Defendant Brittle to fraudulently . . . attempt to and obtain Dr. Zahl's medical practice, business, and medical license." (Id. at 73.) Zahl goes on to accuse Harper of "subordination" of perjury, withholding exculpatory evidence, lying, and procedural abuses. (Id. at 74-75.)

---

[5]The Court notes that earlier in his Amended Complaint, Zahl refers to a complaint filed with the Board on August 5, 1999. As the filing dates are not at issue, however, and the record before this Court is not developed sufficiently to determine if the two actions are the same, there is no need to rule on whether either date is controlling for any purpose.

**E.      Procedural History**

This is not the first case, or the last, filed by Zahl to bring the events summarized <u>supra</u> before this Court.  On March 16, 2001, Zahl brought an action by way of Order to Show Cause for injunctive relief against Harper and other State of New Jersey defendants, attempting to prevent the Attorney General of New Jersey from pursuing portions of the administrative case against Zahl based on Federal preemption.  (D.N.J. Docket No. 01-1264.)  Judge Debevoise dismissed the case on March 30, 2001, based on the doctrine of <u>Younger</u> abstention.  <u>Zahl v. Harper</u>, 282 F.3d 204, 206 (3d Cir. 2002).  The Court of Appeals for the Third Circuit affirmed the District Court.  <u>Zahl</u>, 282 F.3d at 206, 212.  Subsequent to the filing of the instant action, Zahl acted as relator in a False Claims Act <u>qui</u> <u>tam</u> action against Rubinfeld on February 16, 2007, dismissed by Judge Wigenton on May 31, 2007.  (Docket No. 07-0820.)  The State Defendants have brought certain other actions related to Zahl to the attention of this Court. (State Br. at 4 n.2.)

Zahl filed his initial complaint in this case by way of Order to Show Cause on August 10, 2006, seeking temporary and preliminary injunctive relief; this Court denied Zahl's application for temporary restraints on August 28, 2006 and ordered Zahl to show cause why this Court possessed subject matter jurisdiction over his claims.  While the <u>sua</u> <u>sponte</u> order to show cause of this court was pending, on April 30, 2007, Zahl filed an Amended Complaint.  On May 24, 2007, this Court concluded that the issues had changed dramatically due to Zahl's Amended Complaint, and the pending motions were dismissed without prejudice and a preliminary re-filing schedule established.  These motions followed.

**DISCUSSION**

Zahl's Amended Complaint alleges ten counts.  He seeks declaratory judgment under 28 U.S.C. § 2201 that Harper violated Zahl's constitutional rights; both temporary and preliminary injunctive relief under 42 U.S.C. § 1983 to prevent other States' medical licensing agencies from taking action based on the Board's revocation of Zahl's license; damages under § 1983 against Harper; damages under 42 U.S.C. § 1985(3) against Harper, the Kosovskys, McKeown, Blackman, Rubinfeld, and Brittle for conspiring to deny him equal protection under the law; damages against Harper for neglecting or refusing to protect Zahl against a known conspiracy to deny Zahl his right of equal protection; treble damages, attorney's fees, and court costs against the Kosovskys, McKeown, Blackman, and Harper for violating 18 U.S.C. § 1962(c) ("RICO"); injunctive relief, treble damages, attorney's fees, and court costs against the Kosovskys, McKeown, Blackman, Rubinfeld, Brittle, and Harper under 18 U.S.C. § 1964(c) for engaging in a RICO conspiracy; treble damages, attorney's fees, and costs against the Kosovskys, McKeown, Blackman, and Harper for violation of N.J. Rev. Stat. § 2C:41-2c ("NJRICO"); injunctive relief and treble damages against the Kosovskys, McKeown, Blackman, Rubinfeld, Brittle, and Harper for an NJRICO conspiracy; "actual, special, and punitive damages, all costs and disbursements of this action," and other relief against the Kosovskys, McKeown, Blackman, Rubinfeld, Brittle, and Harper for engaging in a civil conspiracy "to deprive Dr. Zahl and the State of New Jersey of honest services and to fraudulently and extortionately drive Dr. Zahl out of business and out of the country and move to the Dominican Republic."  (Id. at 107-121.)

**A.     Legal Standards**

The State Defendants moved before this Court on June 29, 2006, to dismiss the Amended

Complaint under Federal Rules of Civil Procedure 12 under the <u>Rooker-Feldman</u> doctrine,

Eleventh Amendment immunity, claim and issue preclusion (including the entire controversy

doctrine), absolute immunity, qualified immunity, <u>Younger</u> abstention, failure to state a claim,

and failure to effect service.  (State Def. Br. at 16, 23, 27, 34, 44, 46, 50, 57, 58.)  Rubinfeld

moved before this Court on July 16, 2007, with respect only to the counts naming his as a

defendant.  The Kosovsky Defendants moved before this Court on September 21, 2007, to

dismiss the counts naming them as defendants.

### 1.  <u>Rooker-Feldman</u>

The <u>Rooker-Feldman</u> doctrine, so named due to its arising out of the cases <u>Rooker v.</u>

<u>Fidelity Trust Co.</u>, 263 U.S. 413 (1923), and <u>District of Columbia Court of Appeals v. Feldman</u>,

460 U.S. 462 (1983), serves as a jurisdictional bar to "cases brought by state-court losers

complaining of injuries caused by state-court judgments rendered before the district court

proceedings commenced and inviting district court review and rejection of those judgments."

<u>Exxon Mobil Corp. v. Saudi Basic Indus. Corp.</u>, 544 U.S. 280, 284 (2005).  The doctrine

recognizes that the Supreme Court of the United States alone has received a Congressional grant

of authority under 28 U.S.C. § 1257 to hear appeals from state courts, and that lower federal

courts lack the power to undo state court judgments.  <u>Exxon Mobil Corp.</u>, 544 U.S. at 292.

A federal district court, however, is not divested of jurisdiction merely because a litigant

brings a claim in federal court that relies on the same facts as a concurrent or previous state case.

<u>Id.</u>  In parallel or concurrent proceedings, the Supreme Court has held that the <u>Rooker-Feldman</u>

doctrine does not replace the application of preclusion or abstention principles in cases where a

litigant has some claim independent of those decided in the state court ruling.  <u>Id.</u> at 284, 292-

293.  See also Lance v. Dennis, 546 U.S. 459, 466 (2006) (warning against conflation of

preclusion principles with Rooker-Feldman).  The doctrine only applies where the subsequent

federal case seeks redress of injuries caused by the state court judgment.  Exxon Mobil Corp.,

544 U.S. at 283; Turner v. Crawford Square Apartments III, L.P., 449 F.3d 542, 547 (3d Cir.

2006).  Furthermore, Rooker-Feldman is in general only applicable against the same parties

present in the state court litigation.  Lance, 546 U.S. at 466; Three Keys, Ltd. v. SR Utility

Holding Co., 464 F. Supp 2d 388, 395 (D.N.J. Dec. 8, 2006).

        This Circuit has described the claims falling under the Rooker-Feldman bar as those

"actually litigated or 'inextricably intertwined' with adjudication by a state court."  Taliaferro v.

Darby Twp. Zoning Bd., 458 F.3d 181, 192 (3d Cir. 2006).  "[A] federal action is inextricably

intertwined with a state adjudication, and thus barred in federal court under Feldman, [w]here

federal relief can only be predicated upon a conviction that the state court was wrong."

Taliaferro, 458 F.3d at 192 (internal quotations omitted).  A claim may be "inextricably

intertwined" with a state court judgment "even if it was not raised in the state court."  Id. at 193.

## 2.    **Younger** Abstention

        Federal district courts possess discretion in abstaining from taking jurisdiction over

certain claims based on the principles of comity and equity.  Younger v. Harris, 401 U.S. 37, 43-

44 (1971); Addiction Specialists, Inc. v. Township of Hampton, 411 F.3d 399, 408 (3d Cir.

2005).  Abstention, however, is appropriate in only a few, specifically defined situations.

Addiction Specialists, Inc., 411 F.3d at 408.  In order to elect to abstain from a claim under

Younger, a federal district court must first find that "(1) there are ongoing state proceedings that

are judicial in nature; (2) the state proceedings implicate important state interests; and (3) the

state proceedings afford an adequate opportunity to raise the federal claims." Id.

The fact that an ongoing state adjudication may rest on the same facts as the federal case does not, without more, merit abstention. Id. A district court may only exercise its discretion if it finds that all three prongs of the legal predicate for Younger abstention have been met. Id.

### 3.    New Jersey Preclusion Principles

Under the Full Faith and Credit Act, 28 U.S.C. § 1738, this Court must "give the same preclusive effect to a state-court judgment as another court of that State would give." Exxon Mobil Corp., 544 U.S. at 293; Rycoline Prods., Inc. v. C & W Unlimited, 109 F.3d 883, 887 (3d Cir. 1997). In a case related to state proceedings in New Jersey, such as this one, this Court applies the doctrine of the entire controversy as the law of claim preclusion, codified in New Jersey Rule of Civil Procedure:

> Non-joinder of claims required to be joined by the entire
> controversy doctrine shall result in the preclusion of the omitted
> claims to the extent required by the entire controversy doctrine,
> except as otherwise provided by R. 4:64-5 (foreclosure actions)
> and R. 4:67-4(a) (leave required for counterclaims or cross-claims
> in summary actions).

N.J. R. Civ. P. 4:30A. See also Rycoline Prods., Inc., 109 F.3d at 887. The entire controversy doctrine "requires a party to bring in one action all affirmative claims that it might have against another party . . . . or be forever barred from bringing a subsequent action involving the same underlying facts." Rycoline Prods., Inc., 109 F.3d at 885. In construing the entire controversy doctrine, federal courts look to the development of the doctrine in the state courts of New Jersey. Id. at 887. With regard to concurrent claims, however, the entire controversy doctrine is inapplicable: "the entire controversy doctrine only precludes successive suits involving related

claims. It does not require dismissal when multiple actions involving the same or related claims

are pending simultaneously." Id. (quoting Kaselaan & D'Angelo Assocs., Inc. v. Soffian, 675

A.2d 705, 708 (N.J. Super. Ct. App. Div.1996)).

Issue preclusion in New Jersey courts applies if:

> (1) the issue to be precluded is identical to the issue decided in the
> prior proceeding; (2) the issue was actually litigated in the prior
> proceeding; (3) the court in the prior proceeding issued a final

judgment on the merits; (4) the determination of the issue was essential to the prior judgment;
and (5) the party against whom the doctrine is asserted was a party to or in privity with a party to
the earlier proceeding.

Township of Middletown v. Simon, — A.2d —, 2008 WL 123793, *4, *6 (N.J. 2008) (awaiting

pagination in official reporter).  "Even where these requirements are met, the doctrine, which has

its roots in equity, will not be applied when it is unfair to do so."  Hennessey v. Winslow Twp.,

847 A.2d 1, 7 (N.J. Super. Ct. App. Div. 2004).

### 4. Eleventh Amendment Immunity

"The Eleventh Amendment provides unconsenting states with immunity from suits

brought in federal courts by private parties." Febres v. Camden Bd. of Educ., 445 F.3d 227, 229

(3d Cir. 2006).  In order to determined whether an entity may benefit from Eleventh Amendment

immunity, this Circuit applies a three-factor test: "(1) whether the payment of the judgment

would come from the state, (2) what status the entity has under state law, and (3) what degree of

autonomy the entity has." Febres, 445 F.3d at 229.  The party asserting the Eleventh Amendment

bears the burden of establishing it before this Court.  Christy v. Pennsylvania Tpk. Comm'n, 54

F.3d 1140, 1144 (3d Cir. 1995).

An exception to Eleventh Amendment immunity exists for suits against state officials

seeking prospective injunctive relief.  Ex parte Young, 209 U.S. 123 (1908).  However, "the

exception is narrow: It applies only to prospective relief, does not permit judgments against state

officers declaring that they violated federal law in the past, and has no application in suits against

the States and their agencies, which are barred regardless of the relief sought."  Puerto Rico

Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146 (1993); Hinds v. F.D.I.C.,

137 F.3d 148, 166 (3d Cir. 1998) ("The type of prospective relief permitted under Young is relief

intended to prevent a continuing violation of federal law."); Camden Cty. Recovery Coal. v.

Camden City Bd. Of Educ., 262 F. Supp 2d 446, 451 (D.N.J. May 16, 2003) ("It is important to

note that under the Ex parte Young exception there must be an ongoing violation of federal

law.").

### 5.    Absolute and Qualified Immunity

"The Supreme Court has set forth a two-step objective reasonableness test to determine

whether qualified immunity should be granted."  Barton v. Curtis, 497 F.3d 331, 335 (3d Cir.

2007).  The threshold inquiry, in determining whether a party is entitled to qualified immunity is

whether, viewing the facts in the light most favorable to Plaintiff, the facts alleged show that

Defendants' conduct violated a constitutional right. See, e.g., Saucier, 533 U.S. 194, 201 (2001);

Wright, 409 F.3d 595, 600 (3d Cir. 2005).  Thus, Plaintiffs bear the initial burden of showing that

Defendants' conduct violated a constitutional right.  See, e.g., Sherwood v. Mulvihill, 113 F.3d

396, 399 (3d Cir. 1997).  "If no constitutional right would have been violated were the

allegations established, there is no necessity for further inquiries concerning qualified immunity."

Saucier, 533 U.S. at 201.

However, if a favorable view of a Plaintiff's submissions reveals the violation of

constitutional right, this Court must determine whether such a right was clearly established.  See id..; Wright, 409 F.3d at 600.  To be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  See Saucier, 533 U.S. at 202; Barton, 497 F.3d at 335.  Plaintiffs, again, bear the burden of demonstrating that the constitutional or statutory rights at issue were clearly established.  See, e.g., Sherwood, 113 F.3d at 399.  If the Court finds that Defendants violated such clearly established constitutional or statutory rights, they are not entitled to qualified immunity for their actions.  See, e.g., Wright, 409 F.3d at 599-600.

Some defendants are entitled to absolute immunity as opposed to qualified immunity. Light v. Haws, 472 F.3d 74, 77 (3d Cir. 2007).  "[I]n light of the immunity historically accorded prosecutors at common law, state prosecutors are absolutely immune from liability under § 1983 for actions performed in a quasi-judicial role."  Light, 472 F.3d at 77.  Prosecutorial absolute immunity attaches for participation in court proceedings, "conduct intimately associated" with such proceedings, and conduct in preparation for judicial proceedings in an advocacy role.  Id. Public officials and private citizens also receive absolute immunity for conduct in the function as judicial witnesses.  Brisoe v. LaHue, 460 U.S. 325 (1983); Hughes v. Long, 242 F.3d 121, 125 (3d Cir. 2001); Ernst v. Child and Youth Servs. of Chester Cty., 108 F.3d 486, 494 (3d Cir. 1997).  The proponent of absolute immunity bears the burden of establishing it.  Light, 472 F.3d at 78; Yarris v. County of Delaware, 465 F.3d 129, 135 (3d Cir. 2006).

### 6.    Failure to State a Claim

The applicable inquiry under Federal Rule of Civil Procedure 12(b)(6) is well-settled.

Courts must accept all well-pleaded allegations in the complaint as true and draw all reasonable

inferences in favor of the non-moving party.[6]  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974),

abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982); Allegheny Gen. Hosp.

v. Philip Morris, Inc., 228 F.3d 429, 434-35 (3d Cir. 2000).  However, courts are not required to

credit bald assertions or legal conclusions improperly alleged in the complaint.  See In re

Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429 (3d Cir. 1997).  Similarly, legal

conclusions draped in the guise of factual allegations may not benefit from the presumption of

truthfulness.  See In re Nice Sys., Ltd. Sec. Litig., 135 F. Supp. 2d 551, 565 (D.N.J. 2001).

    A sound complaint must set forth "a short and plain statement of the claim showing that

the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This statement must "give the defendant

fair notice of what the . . . claim is and the grounds upon which it rests."  Bell Atl. Corp. v.

Twombly, 127 S.Ct. 1955, 1959 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).

Moreover, "factual allegations must be enough to raise a right to relief above the speculative

level on the assumption that all of the complaint's allegations are true."  Id.  Ultimately, however,

the question is not whether plaintiffs will prevail at trial, but whether they should be given an

opportunity to offer evidence in support of their claims.  Scheuer, 416 U.S. at 236.

**B.    Subject Matter Jurisdiction**

    In alleging that the Amended Complaint requests relief beyond the scope of this Court's

_____

    [6] In doing so, a court may look only to the facts alleged in the complaint and any
accompanying attachments, and may not look at the record. See Jordan v. Fox, Rothschild,
O'Brien & Frankel, 20 F.3d 1251, 1261 (3d Cir. 1994).

jurisdiction, the State Defendants primarily rely on the <u>Rooker-Feldman</u> doctrine.[7]  They assert

that Zahl's "disproportionate treatment" (equal protection) claim has already been presented and

decided by the Supreme Court of New Jersey; that the Appellate Division of the New Jersey

Superior Court decided the issues related to the imposition of his practice monitoring; that his

attempt to prevent any extraterritorial effect of the revocation of his New Jersey medical license

would void the judgments of state courts in New Jersey; and that various New Jersey state courts

found no merit in his claims of "prosecutorial misconduct"—presumably referring to Zahl's

numerous claims against Harper.  (State Def. Br. at 19-20, 21-22.)  In essence, State Defendants

base their motion on the theory that Zahl's claims have either been ruled on in state court or that

Zahl seeks relief against the effects of state court rulings in this Court.

 Zahl seeks to avoid the <u>Rooker-Feldman</u> jurisdictional bar by invoking the Supreme

Court's recent decision in <u>Exxon Mobil Corp. v. Saudi Basic Industries Corp.</u>, 544 U.S. 280

(2005), and asserting that the claims in the Amended Complaint are "independent."  (Pl. Opp. Br.

to State Def. Br. at 7.)  Furthermore, Zahl argues that the prospective injunction he seeks is not

subject to <u>Rooker-Feldman</u>, and that a § 1983 claim concerning misconduct that <u>contributed</u> to

the state judgment is not barred by the doctrine.  (<u>Id.</u> at 9-10.)  Zahl's arguments seek, in general,

to emphasize that the relief he seeks would not rectify harm done by any of the New Jersey state

court judgments concerning his medical license.

 Zahl appears to have exhaustively litigated this matter at every available level of the New

---

[7]The State Defendants make an incipient argument that some of Zahl's relief violates some broader principle of full faith and credit, but as this argument is not pursued independently of the <u>Rooker-Feldman</u> argument, this Court will treat the issue as entirely subsumed within <u>Rooker-Feldman</u>.  (State Def. Br. at 20.)

Jersey judiciary, and has initiated several suits in this Court seeking relief on the same underlying facts. Most of his claims in the instant matter are, however, sufficiently independent of those litigated and adjudicated at the state level to avoid the exceptionally narrow grounds upon which Rooker-Feldman now rests. Exxon Mobil Corp., 544 U.S. at 283. In particular, Plaintiff quite correctly relies on the case of Marran v. Marran, 376 F.3d 143, 153-54 (3d Cir. 2004), which states that a claim under § 1983 for misconduct by state actors resulting in a state court judgment—when not attacking the judgment itself—does not fall under the Rooker-Feldman bar. Most of Plaintiff's claims are permissible under Marran, as they pursue alleged misconduct by state actors operating alone, or in illegal concert with private individuals, in an attempt to deny Zahl the opportunity to practice his profession.

The exceptional claim in Zahl's complaint that presents a close issue under Rooker-Feldman is his request that this Court enter an order preventing the medical boards of states other than New Jersey from giving force and effect to the revocation of Zahl's New Jersey medical license. (Am. Compl. at 108-10.) Zahl, with respect to the loss of his New Jersey medical license, is a state court loser within the framework of Exxon Mobil Corp. 544 U.S. at 284. The New Jersey Supreme Court reversed the New Jersey Appellate Division and held Zahl's medical license to be revoked. In re Zahl, 895 A.2d 437, 443, 445 (N.J. 2006) (affirming the Board's findings that "that the panoply of dishonest acts committed by Dr. Zahl support, if not dictate, imposition of the severe penalty of license revocation."). The only avenue of appeal from the decision of the New Jersey Supreme Court and the effects flowing therefrom was to seek review of his case, via 28 U.S.C. § 1257, in the United States Supreme Court. To the knowledge of this Court, Zahl declined to do so.

Zahls' specific request for relief pertaining to the extraterritorial effects of the Board's decision is couched in the following terms:

> The temporary and preliminary injunctive relief sought in this action expressly does not in any way appeal or seek to have this Court reverse or find the board's decision erroneous. The temporary and preliminary injunctive relief sought in this action expressly does not in any way appeal or seek to have the Court reverse or find the board's Practice Monitor and related suspension decision to be erroneous. Rather, the *prospective* temporary and preliminary injunctive relief sought in this action merely seeks to preserve the status quo during this litigation by having the Court enjoin the efficacy of the board's revocation decision as far as the revocation decision may otherwise be relied upon by other states to suspend or revoke Dr. Zahl's medical license.

(Am. Compl. at 3.)

> The Plaintiff will suffer irreparable harm if the temporary and prospective injunctive relief preserving the status quo by enjoining the efficacy of the state board's revocation decision as far as the revocation decision may otherwise be relied upon by other states to suspend or revoke Dr. Zahl's medical license. Specifically, pending proceedings in New York to review Dr. Zahl's medical license and his continued ability to practice medicine in New York are solely based on the aforesaid revocation of Dr. Zahl's medical license that resulted from Defendant Harper's vindictive, biased and wholly arbitrary overawing of the state medical board in depravation of Dr. Zahl's constitutional rights. . . .

> Unless the continued efficacy of the New Jersey medical licensure revocation is *prospectively* enjoined Dr. Zahl's entire livelihood is threatened by potential revocation of his license to practice medicine in other states solely based upon revocation of his medical license resulting from Defendants' aforesaid unconstitutional improper motives and conduct. . . .

> The Plaintiff's claims are not recognizable in any other forum. . . .

WHEREFORE the Plaintiff, Dr. Kenneth Zahl, M.D. demands entry of a temporary restraining order and prospective preliminary injunction under 42 U.S.C. § 1983 to preserve the status quo pending final judgment in this action by enjoining the further efficacy of the revocation decision as far as the revocation decision may otherwise be relied upon by other states  to suspend or revoke Dr. Zahl's medical license.

(Am. Compl. at 108-110.)  Zahl's request that this Court enter an order "enjoining the further efficacy" of the Board's revocation of his license in other states is not quite a request that this Court reverse the decisions of the Board and the New Jersey Supreme Court.  (Id. at 110.) Instead, given that Zahl has not joined the medical license boards of either New York or Pennsylvania, and this Court therefore lacks jurisdiction over such entities to enter an order enjoining their actions, this request for injunctive relief can only be interpreted as a request to modify the decision of the Board.

Reluctant as this Court is to invoke the Rooker-Feldman doctrine after Exxon Mobil Corp. and Lance v. Dennis, modification of a state court judgment in a federal district court is permissible only under a grant of authority from Congress, such as that provided under 28 U.S.C. § 2255 (habeas corpus).  Otherwise, even if a state court judgment is unconstitutional on its face, this Court lacks the authority to circumvent the writ of certiorari process established by Congress permitting Supreme Court review of state court judgments.

To the extent that Zahl seeks prospective redress only of the effects of a state court judgment, this Circuit has noted that harms flowing from a state court judgment are part and parcel of the judgment itself.  Turner v. Crawford Square Apartments III, L.P., 449 F.3d 542, 547 (3d Cir. 2006).  Turner involved a landlord-tenant dispute filed in state court on contract grounds

and then, in a subsequent action, in federal court under the Fair Housing Act.  449 F.3d at 545-

46.  The Third Circuit found that the <u>Turner</u> plaintiff alleged harms not caused by the state court

judgment, and that <u>Rooker-Feldman</u>, after <u>Exxon Mobil Corp.</u>, required that a party allege harm

caused by the prior state court judgment.  <u>Id.</u> at 547.

Contrary to the <u>Turner</u> context, Zahl's plea for a limitation on the extraterritorial effect of

the Board's decision revoking his New Jersey medical license is an attempt to forestall harm that

proceeds immediately from the state court adjudication.  This is not a situation where a plaintiff

has merely filed an independent federal claim based on the same underlying facts, as condoned

by <u>Exxon Mobil Corp.</u>, 544 U.S. at 292, and <u>Turner</u>, 449 F.3d at 547.  Zahl attempts to color his

claim for injunctive relief in that light by noting that the injunctive relief would be based on 42

U.S.C. § 1983; unfortunately for Zahl, § 1983 does not permit this Court to review or otherwise

modify the judgment of the New Jersey Supreme Court or the Board (in its adjudicatory

capacity).  Even under the <u>Ex parte Young</u> fiction, § 1983 grants relief only against persons and

persons acting in the official capacities of an office to which liability attaches, not against state

adjudications.  42 U.S.C. § 1983; <u>Ex parte Young</u>, 209 U.S. 123 (1908).  Zahl's other § 1983

claims are not barred by <u>Rooker-Feldman</u> precisely because they seek relief on grounds

independent of the decisions of the New Jersey Supreme Court and the Board and that they <u>do</u>

<u>not</u> attempt to directly attack or modify the revocation of Zahl's New Jersey license.

Zahl's request for injunctive relief under Count Two, preventing the New Jersey

revocation from impacting his medical licenses in other states, is, for the foregoing reasons,

beyond the jurisdiction of this Court under the <u>Rooker-Feldman</u> doctrine.[8]  As this decision is

grounded in the limited subject matter jurisdiction of this Court, Zahl's plea for injunctive relief

under Count Two is dismissed without prejudice.

**C.    <u>Younger</u> Abstention**

Zahl is no stranger to the application of federal abstention doctrine.  As noted <u>supra</u>,

Zahl's previous foray into the federal courts resulted in a reported opinion of the Court of

Appeals, <u>Zahl v. Harper</u>. 282 F.3d 204 (3d Cir. 2002) (hereinafter <u>Harper</u>).  In <u>Harper</u>, Plaintiff

attempted to forestall two of the counts against him in Zahl I by filing an action in federal court

claiming that portions of the Zahl I complaint before the Board were preempted by federal law

governing the Medicare system.  <u>Harper</u>, 282 F.3d at 206, 208.  The Third Circuit found that the

administrative proceedings before the Board were judicial in nature, that the Board's proceedings

implicated the important state interest of regulating the medical profession, and that Zahl had the

ability to pursue his legal challenges to the jurisdiction of the Board in both the administrative

proceedings and on appeal in New Jersey state courts.  <u>Id.</u> at 209-210.

Here, the State Defendants request that this Court abstain from Zahl's claims inasmuch as

they raise issues currently under consideration in Zahl II, currently before the Board and the state

courts of New Jersey.  (State Def. Br. at 44-46.)  Specifically, the State Defendants claim that

Zahl's paragraphs 87-102 and paragraphs 200-204 of the Amended Complaint relate to Zahl II

---

[8]While the Court also questions whether Zahl has joined all of the proper parties to
receive this relief, inasmuch as the medical licensing agencies of Pennsylvania and New York are
not defendants in this matter, it is not necessary to reach this issue due to the absence of subject
matter jurisdiction over the claim itself.  See <u>Step-Saver Data Sys., Inc. v. Wyse Tech.</u>, 912 F.2d
643, 647 (3d Cir. 1990) (requiring adversity of parties in a ripeness analysis).

and that this Court should abstain from any of Zahl's claims arising from the issues currently

under judicial or quasi-judicial review in Zahl II.  (State Def. Br. at 45.)  Zahl argues that

abstention is not appropriate here because the state proceedings in Zahl II do not afford him a

forum to bring his claims, and also because the Zahl II proceedings come under an exception to

the abstention doctrine for bad faith harassment.  (Pl. Opp. Br. at 36.)

 This Court applies the test developed in Middlesex County Ethics Commission v. Garden

State Bar Association when determining whether to apply the doctrine of Younger abstention.

457 U.S. 423 (1982); Addiction Specialists, Inc. v. Township of Hampton, 411 F.3d 399, 408 (3d

Cir. 2005).   The three prongs of the test are: ongoing, judicial state proceedings; important state

interests implicated by the state proceedings; and an opportunity to bring federal claims in the

state proceedings.  Addiction Specialists, Inc., 411 F.3d at 408.  If all of the prongs are met, this

Court exercises its discretion in deciding to abstain or not to abstain.  Id.

 For reasons essentially identical to those in Harper, this Court finds that all three prongs

of the Middlesex test have been met with regard to the Amended Complaint.  Zahl, indeed, does

not challenge the State Defendant's contentions on the first two prongs.  The proceedings in Zahl

II, whether before the Board or on appeal in the Appellate Division or Supreme Court of New

Jersey, clearly constitute a judicial proceeding.  Harper, 282 F.3d at 209.  Furthermore, New

Jersey possesses a strong state interest in assessing and maintaining the professional standards of

the practice of medicine within its borders.  Id.

 Zahl disputes the State Defendant's contention that he has the opportunity to raise his

concerns in the state proceedings.  (Pl. Opp. Br. at 36.)  He attaches to his brief a colloquy with

the ALJ in Zahl II, where the ALJ appears to forestall Zahl's effort to present a "vindictiveness" case:

> **ZAHL:** . . . So, hypothetically, if I'm charged with something in this court, I win/lose or however you want to look at it or the state wins or loses, the medical board can accept, reject, or modify your decision. And if I'm not happy with it, I get one level appeal to the Appellate Division and I get potentially a second level of appeal to the Supreme Court as they give you a certification. But if I don't litigate the underlying vindictiveness, I argue then I just have to go to Federal District Court.
>
> So I would almost want a declaratory opinion that I can get into these vindictive type of things in this particular case . . .
>
> **ALJ:** I mean, that's why you're in Federal Court. You have other forums to resolve that issue. You've characterized what's going to happen here properly. The board has sent this case over for me to make factual determinations about what you did or what you didn't do when you were supposed to do it and when you weren't supposed to do it.
>
> Whether or not it's vindictive or whether the attorney general's office did something that you consider vindictive is not going to be something I can resolve because it's not an issue in front of me.
>
> If you're saying that they charged you with these things vindictively and you didn't do them, well, then whether they did it vindictively or not is irrelevant. . . .

(Pl. Opp. Br. to State Def. Br., Ex. 1 at 15-16.) Zahl characterizes this exchange as ending his opportunity to present his "vindictiveness" case regarding the practice and billing monitoring in Zahl II. (Pl. Opp. Br. to State Def. Br. at 36.)

Zahl has, therefore, attempted to present some of the claims in this suit—characterized in his opposition papers as "constitutional claims or other vindictiveness and unlawful conduct claims"—before the ALJ in Zahl II. (Pl. Opp. Br. to State Def. Br. at 36.) Under New Jersey

Rule 2:2-3(a)(2),  he may appeal this ruling of the ALJ when any administrative action by the Board becomes final in Zahl II.  On appeal to the Appellate Division, that court will be able to address the "vindictiveness" claims in Zahl II, whether they arise under state or federal law. Harper, 282 F.3d at 210.  In presenting these claims before the ALJ in Zahl II, Plaintiff has satisfied the third element of the Younger/Middlesex abstention test, because the New Jersey administrative and appellate judicial system is competent to rule on these claims.  Harper, 282 F.3d at 210.

It is not a foregone conclusion, however, that when claims satisfy Younger preemption a court necessarily must abstain. Abstention serves the principle of comity and requires a weighing of the federal and state interests involved.  Id. at 210-11.  Furthermore, if there is any question concerning the ability of the state courts to adjudicate the claims subject to abstention, this Court must lean toward retaining jurisdiction over the claims.  Addiction Specialists, Inc., 411 F.3d at 414.  This Court finds the analysis in Harper applicable in the current context.  282 F.3d at 210-11.  New Jersey is conducting a state administrative proceeding regarding Zahl's compliance with procedures ordered by the Board; the state of New Jersey has a "heavy and traditional interest in regulating the practice of medicine within its borders;" and despite Zahl's claims to the contrary, he appears not only to have presented his "vindictiveness" claims to the ALJ in Zahl II, but he has a yet-unrealized right to appellate review of any administrative-level determination that his "vindictiveness" claims should be heard in Zahl II.  Id. at 210-11.  Under these circumstances, this Court finds that abstaining from adjudicating any claims in the Amended Complaint related to Zahl II is the proper course of action.

Determining which claims are, indeed, related to Zahl II is more difficult.  The State

Defendants argue that paragraphs 87-102 and 200-204 are definitely related to Zahl II, but note that the Amended Complaint is wide-ranging and diffuse with regard to many of its allegations. (State Def. Br. at 46.)  This Court's independent examination of Zahl's Amended Complaint indicates that many other portions of the Amended Complaint mention or allude to the alleged activities of all relevant Defendants with respect to the practice and billing monitoring imposed upon Zahl.  See, e.g., Am. Compl. at 2, 3, 5-6, 26-31, 39.  Not all of these portions of the Amended Complaint necessarily speak only to facts related to Zahl II; and because the facts underlying Zahl II may have some overlap with Zahl I—the monitoring requirements were imposed on Zahl while the loss of his license was stayed pending appeal—it is not possible to filter out paragraphs of the Amended Complaint that are purely related to Zahl II.  Furthermore, this Court is cognizant that the abstention doctrine does not favor a court's refusal to entertain claims in a manner that would permit some issues to fade from sight of either tribunal due to an overbroad statement of abstention.  Addiction Specialists, Inc., 411 F.3d at 414.  With regard to Zahl's claims that are currently subject to proceedings before the Board and the courts of New Jersey, this Court abstains from hearing Zahl's claims inasmuch as they relate to the initiation or imposition of the practice and billing monitoring procedures by the Board after his medical license revocation was stayed on April 11, 2003, as generally described in the Amended Complaint on pages 26 through 32, paragraphs 87 through 102.[9]  The effect of this Court's

---

[9]Aware as it is of the hair-trigger litigation reflexes of the parties, this Court notes that some facts underpinning this matter may overlap legal issues related to Zahl I and Zahl II.  Such facts will be considered, when relevant and necessary, to decide each motion or issue before the Court, and this Court does not rule at this time that certain facts are only relevant to Zahl II.  This Court is abstaining from ruling on claims associated with Zahl II, not the factual predicates therefore, as Younger abstention is distinct from preclusion doctrines.  See Lui v. Commission, Adult Entm't, 369 F.3d 319, 327 (3d Cir. 2004) (noting that Younger abstention results in res

abstention with relation to any legal claims related to Zahl II is those claims are dismissed with prejudice.  Schall v. Joyce, 885 F.2d 101, 105 (3d Cir. 1989).

**D.     New Jersey Preclusion Principles**

The State Defendants claim in their motion to dismiss that either issue preclusion or the doctrine of the entire controversy mandate dismissal of Zahl's Amended Complaint in its entirety as to all defendants.  (State Def. Br. at 28.)  Zahl argues in response that the elements of collateral estoppel and res judicata have not been met, and also that he never presented any "independent 'prosecutorial misconduct'" claims, "independent unconstitutionally biased and vindictiveness claims," or "independent unlawful conduct civil RICO based federal and state claims" in Zahl I.  (Pl. Opp. Br. to State Def. Br. at 15-30.)

**1.     Doctrine of the Entire Controversy**

As a prefatory matter, the Court recognizes that it is required by the Full Faith and Credit Act, 28 U.S.C. § 1738, to apply the prior decisions of state courts with the same preclusive effect they would possess in their own jurisdiction.  Rycoline Prods., Inc. v. C & W Unlimited, 109 F.3d 883, 887 (3d Cir. 1997).  As the prior litigation at issue (with regard to preclusion principles) occurred entirely in state court, this Court applies the entire controversy doctrine as the applicable principle of claim preclusion.[10]  See Paramount Aviation Corp. v. Agusta, 178

_____

judicata effect of state proceedings in case).

[10]The cases of this Circuit teach that the specific term "claim preclusion" is to be preferred to "res judicata," as the latter term actually embraces both claim and issue preclusion, despite its common legal usage.  General Elec. Co. v. Deutz AG, 270 F.3d 144, 157 n.5 (3d Cir. 2001); Venuto v. Witco Corp., 117 F.3d 754, 758 (3d Cir. 1997).  Recognizing this distinction, this Court's discussion will employ the term "claim preclusion" rather than "res judicata" when

F.3d 132, 145 (3d Cir. 1999) (limiting effect of entire controversy doctrine in federal court to

preclusive effect of New Jersey state court judgments, and excepting federal court judgments

from it).

      The entire controversy doctrine operates in a manner similar to traditional claim

preclusion, with the added wrinkle that it imposes a mandatory joinder of all claims (not all

parties) related to the facts underlying the first cause of action.  <u>Allstate N.J. Ins. Co. v. Cherry

Hill Pain and Rehab Inst.</u>, 911 A.2d 493, 499 (N.J. Super. Ct. App. Div. 2006).  New Jersey's

claim preclusion principles include the central elements of the traditional test: "(1) the judgment

in the prior action must be valid, final, and on the merits; (2) the parties in the later action must

be identical to or in privity with those in the prior action; and (3) the claim in the later action

must grow out of the same transaction or occurrence as the claim in the earlier one." <u>Olds v.

Donnelly</u>, 677 A.2d 238, 243 (N.J. Super. Ct. App. Div. 1996), <u>aff'd</u>, 696 A.2d 633 (N.J. 1997);

<u>Watkins v. Resorts Intern. Hotel and Casino, Inc.</u>, 591 A.2d 592, 599 (N.J. 1991) (source of

quotation); <u>Culver v. Insurance Co. of N. Am.</u>, 559 A.2d 400, 405 (N.J. 1989).  In the interests of

judicial economy and fairness, the doctrine of the entire controversy in New Jersey requires a

more stringent joinder of claims than traditional claim preclusion.  N.J. R. Civ. P. 4:30A.

Mandatory joinder of claims applies, in the interest of fairness to the parties, when a party "had a

fair and reasonable opportunity to have fully litigate that claim in the original action."  <u>Allstate

N.J. Ins. Co.</u>, 911 A.2d at 499.  Full litigation means that a prior action has been resolved in a

judgment or a settlement.  <u>Id.</u>

―――――――――――――

analyzing the legal issues in this matter, regardless of the terms utilized in the parties' briefing.

Having already found that this Court should abstain from proceeding further on any claims related to Zahl II, the only issues extant are those involved with Zahl I or those uninvolved with either of the state court Zahl cases.  Claim preclusion under the entire controversy doctrine would only apply, therefore, to any judgment rendered in Zahl I.

Under this standard, this Court notes that many defendants in this matter cannot avail themselves of the entire controversy doctrine.  Neither the Kosovsky Defendants, nor Rubinfeld, Brittle, Blackman, or McKeown were parties to Zahl I or in privity with any of the litigants in Zahl I.  In re License Issued to Zahl, 895 A.2d 437 (N.J. 2006); Kenny Dec. Ex. A, D.  Since 1998, the entire controversy doctrine has generally not required mandatory joinder of parties.  Hillsborough Twp. Bd. of Educ. v. Faridy Thorne Frayta, P.C., 728 A.2d 857, 861 (N.J. Super. Ct. App. Div. 1999).  As these individual defendants had no relation of privity with in that action with regard to Zahl, the Board, the New Jersey Department of Law and Public Safety, or the New Jersey Attorney General, this Court finds that the Kosovsky Defendants, Rubinfeld, Brittle, Blackman, and McKeown cannot have any portion of the Amended Complaint dismissed against them under the entire controversy doctrine.  Olds, 677 A.2d at 243; Hillsborough Twp. Bd. of Educ., 728 A.2d at 861.

The State Defendants, however, were certainly the same parties at interest in Zahl I, at least with respect to their official capacities.  "In the claim preclusion context, governmental officials sued in their official capacities for actions taken in the course of their duties are considered in privity with the governmental body."  Gregory v. Chehi, 843 F.2d 111, 120 (3d Cir. 1988); Mantz v. Chain, 239 F. Supp 2d 486, 506 n.5 (D.N.J. Dec. 30, 2002).  State Defendants the New Jersey Department of Law and Public Safety, Division of Consumer Affairs, and Kenny

-31-

are therefore wholly in privity with the arm of the State of New Jersey serving as the party in Zahl I.

The State Defendants sued outside of their official capacities, however, are not in privity with the parties to Zahl I under traditional claim preclusion principles.  See Edmundson v. Borough of Kennett Square, 4 F.3d 186, 191 (3d Cir. 1993) (discussing § 1983 under Pennsylvania preclusion principles).  While at least one case exists that extends official-capacity privity to individual-capacity privity in a § 1983 suit, Opdycke v. Stout, 233 F.App'x 125, 129 n.3 (3d Cir. 2007) (unreported), the context of Zahl's case does not equitably support the application of a claim preclusion bar to the individual-capacity State Defendants.  Thomas v. Hargest, 834 A.2d 409, 413 (N.J. Super. App. Div. 2003) (noting equitable nature of the doctrine of the entire controversy).  Zahl I was brought by the state in an administrative proceeding, and while he seems to have raised many of his procedural claims in his appeal before the Appellate Division, the record before this Court is insufficient to demonstrate that Zahl was given the opportunity to bring his individual-capacity claims in Zahl I against additional defendants.

With regard to the finality of the Zahl I decisions, this Court has engaged in an independent review of the record, including the April 3, 2003, order of the Board revoking Zahl's medical license, the unpublished decision of the Appellate Division on Zahl's appeal of the Board's order, and the Supreme Court of New Jersey's opinion on appeal from the Appellate Division.  In re Zahl, 895 A.2d 437 (N.J. 2006); Kenny Dec. Ex. A, D.  As Zahl appears to have elected not to appeal the decision of the New Jersey Supreme Court to the United States Supreme Court, this Court finds that with respect to any matters decided therein, these decisions are final, valid, and on the merits.

Finally, this Court turns to the final claim preclusion factor, whether this case grew out of the same transaction or occurrence as Zahl I.  The Supreme Court of New Jersey opinion in Zahl I was limited to the issue of the propriety of the sanction applied under the original Zahl I complaint before the Board; similarly, the April 3, 2003, decision of the Board limits its discussion to that original complaint.  In re Zahl, 895 A.2d at 443-47; Kenny Dec. Ex. A at 2a-3a, 7a-16a.  Neither opinion discusses the wide variety of "vindictiveness" and conspiracy charges laid by Zahl in this proceeding.

The unpublished decision of the Appellate Division, however, discusses in some detail "procedural irregularities both prior to and during the proceedings that led to the ALJ's decision."  (Kenny Dec. Ex. D at 82a.)  The Appellate Division construed Zahl's contentions concerning these "irregularities" as due process claims concerning "misconduct on the part of the Attorney General."  (Id. at 82a-83a.)  In defining the factual predicate for Zahl's due process claims, the Appellate Division stated:

> The events on which [Zahl] relies are: (1) failing to produce certain documents relating to the Medicare counts in a timely fashion; (2) obtaining a misleading certification from Blackman; (3) permitting Blackman to have unsupervised access to the patient records without notice to Zahl; (4) withholding documents relating to the Equitable disability claim; (5) providing confidential records to attorneys involved in Zahl's litigation against Equitable; (6) providing copies of documents to Federal ALJ O'Leary; and (7) using confidential documents obtained in Zahl's matrimonial action to attack his character.

(Id. at 83a.)  The Appellate division analyzed and considered these events and found that there was no violation of Zahl's due process rights.  (Id. at 83a-86a.)

This Court recognizes that a wide range of tests might apply to any particular application

-33-

of due process doctrines, as New Jersey law differs substantially from Federal law in certain

respects.  See, e.g., Elwell v. Township of Lower, 2006 WL 3797974, at *13-14 (N.J. Super. Ct.

Dec. 22, 2006) (distinguishing between New Jersey and Federal tests for substantive due process

claims).  Under the principles of full faith and credit, however, this Court is not concerned with

the bases for the ruling of the Appellate Division with regard to Zahl's due process claims: Zahl

had the opportunity to raise any legal claims based on the facts considered by the Appellate

Division at that time with respect to the parties in Zahl I.  Robertson v. Central Jersey Bank &

Trust Co., 47 F.3d 1268, 1270 n.1 (3d Cir. 1995); Edmundson, 4 F.3d at 189 ("Claim preclusion .

. . is broader in effect and prohibits reexamination not only of matters actually decided in the

prior case, but also those that the parties might have, but did not, assert in that action.").  As Zahl

could have argued Equal Protection violations, or other constitutional violations, such as First

Amendment claims, at the same time he argued due process defects before the Appellate

Division, these claims should have been raised before the Appellate Division in order to avoid

the bar of claim preclusion.  Edmundson, 4 F.3d at 189.  Similarly, as the New Jersey Supreme

Court refused to grant appellate review of these issues, In re Zahl, 884 A.2d 1267 (N.J. 2005)

(table), and Zahl does not contend before this Court that the Appellate Division was incompetent

to hear these claims for any reason, the Full Faith and Credit statute requires that this Court give

preclusive effect to the Appellate Division's determination.  28 U.S.C. § 1738; Towers, Perrin,

Forster & Crosby, Inc. v. Brown, 732 F.2d 345, 347 (3d Cir. 1984); James v. Francesco, 295

A.2d 633, 635 (N.J. 1972); Restatement (Second) of Judgments § 105 (1971).  This Court

therefore finds that the seven events listed by the Appellate Division satisfy the requirements of

claim preclusion with respect to the official-capacity State Defendants, and any claims in the

Amended Complaint as to those defendants dependent on those events are dismissed with prejudice.

Determining which claims fall under the claim preclusion bar in Zahl's "shotgun" pleading[11] is not a simple matter, but this Court has retained jurisdiction only over matters related to Zahl I and other acts by defendants unrelated to Zahl II, somewhat simplifying the Court's responsibility. Harper's involvement in Zahl's case, from the face of the Amended Complaint, was limited to his advocacy in Zahl I and his contact with the monitors in Zahl II. As this Court has abstained from any allegations concerning Zahl II, and Harper's only remaining involvement in this matter pertains to Zahl I, any constitutional claims against Harper are dismissed with prejudice under claim preclusion as intertwined with the seven allegations made before the Appellate Division in Zahl I. Count One of the Amended Complaint contains four substantive allegations: the three relating to Harper denying Zahl's Fourteenth Amendment Equal Protection rights are barred by claim preclusion, while the fourth, that "the conduct of defendants, as aforesaid, was, and is, illegal," is not so barred. (Am. Compl. at ¶ 240(1).) This Court has already declined to extend jurisdiction on Count Two of the Amended Complaint, but notes that insofar as Count Two relies on Harper's "depravation of Dr. Zahl's constitutional rights of equal protection of the law," such a claim is also barred by claim preclusion. (Id. at ¶ 243-44.) Count Three, against Harper only, is also barred, as it relies upon constitutional theories that could have been raised before the Appellate Division with respect to Zahl I. (Id. at ¶ 250-51.) The Court finds that it is unclear from the present state of the pleadings whether or not Count Four, alleging

---

[11] See Opdycke v. Stout, 233 F.App'x 125, 127 (3d Cir. 2007) (unreported) (noting that shotgun complaints create "a task that can be quite onerous for courts").

a conspiracy between Harper and other non-State Defendants, could have been brought during

Zahl I, as several individuals named in that count were not parties to or in privity with parties to

Zahl I, and therefore the Court declines to dismiss Count Four based on claim preclusion at this

time.  For similar reasons, the Court at this stage also refuses to dismiss Count Five against

Harper.  The Court will note, however, that should discovery in this case provide a basis for a

motion for summary judgment based on claim preclusion with respect to Counts Four and Five,

the Court will entertain such a motion at the appropriate time.  Counts Six through Ten do not

rely upon theories of constitutional violations against primarily State Defendants, and therefore

are not implicated by the bar of claim preclusion.

### 2.    Issue Preclusion

New Jersey's doctrine of issue preclusion bars a claim if

> (1) the issue to be precluded is identical to the issue decided in the
> prior proceeding; (2) the issue was actually litigated in the prior
> proceeding; (3) the court in the prior proceeding issued a final
> judgment on the merits; (4) the determination of the issue was
> essential to the prior judgment; and (5) the party against whom the
> doctrine is asserted was a party to or in privity with a party to the
> earlier proceeding.

Township of Middletown v. Simon, — A.2d —, 2008 WL 123793, *4, *6 (N.J. 2008) (awaiting

pagination in official reporter).  A full analysis of issue preclusion is not necessary, however, as

this Court finds that the determination of the issues raised by Zahl in the instant matter were not

the same as those raised before the Appellate Division in Zahl I.  The only prior Zahl I judgment

addressing the instant claims was that of the Appellate Division.  In re Zahl, 895 A.2d 437 (N.J.

2006); Kenny Dec. Ex. D at 82a-86a.  In that decision, while the seven events discussed supra

were considered by that court, and the Appellate Division decided that no infringement of Zahl's

due process rights had occurred in Zahl I, this Court notes that Zahl has plead only equal

protection and First Amendment claims in his Amended Complaint.  (Am. Compl. at 107-12.)

Issue preclusion only applies when the same issue decided in a prior case, not just the underlying

facts, is presented to another court.  Edmundson, 4 F.3d at 189.  Here, the Appellate Division

discussed only due process, and not equal protection theories regarding any facts on which Zahl's

instant case depends, and thus issue preclusion is inapplicable.  (Kenny Dec. Ex. D at 82a-86a.)

**E.      Eleventh Amendment Immunity and the Definition of "Person" in § 1983**

The State Defendants argue that under Eleventh Amendment principles, the entire action

must be dismissed as to all of the State Defendants (except for Chief Justice Rabner and Harper

in their individual capacities) as against state agencies, and that Counts One and Two of the

Amended Complaint must be dismissed entirely as requesting retrospective relief.  (State Def.

Br. at 24-25.)  Plaintiff argues that the relief he requests before this Court is permissible under

the Ex parte Young exception to Eleventh Amendment immunity, as he seeks only prospective

injunctive relief against the state, and civil damages against persons in their individual capacities.

209 U.S. 123 (1908); Pl. Opp. to State Def. Br. at 12-14.

"Unless a State has waived its Eleventh Amendment immunity or Congress has

overridden it, however, a State cannot be sued directly in its own name regardless of the relief

sought. Thus, implementation of state policy or custom may be reached in federal court only

because official-capacity actions for prospective relief are not treated as actions against the

State." Koslow v. Commonwealth of Pennsylvania, 302 F.3d 161, 178 (3d Cr. 2002) (quoting

Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985)).  Zahl does not argue that either Congress

or New Jersey have waived New Jersey's sovereign immunity with respect to the acts alleged in

Counts One and Two, and this Court is not aware of any such waiver.  See N.J. Stat. Ann. § 59:2-

5 (immunity reserved under New Jersey Tort Claims Act by public entities and employees for

license revocation); Pl. Opp. Br. to State Def. Br. at 12-14.)  Defendant the State of New Jersey,

therefore, is beyond the reach of Zahl's Amended Complaint by virtue of Eleventh Amendment

immunity.  See United States v. Commonwealth of Pennsylvania, 902 F.Supp. 565, 579 n.4 (3d

Cir. 1995).

        The State Defendants claim that in addition to the state itself, that certain other

defendants—the New Jersey Department of Law and Public Safety, Division of Consumer

Affairs, and the Board of Medical Examiners—are arms of the state and the claims against these

entities must be dismissed.  (State Def. Br. at 25-27.)  This Circuit applies a three-factor test to

determine if an entity is an arm of the state for Eleventh Amendment purposes: "(1) whether the

payment of the judgment would come from the state; (2) what status the entity has under state

law; and (3) what degree of autonomy the entity has."  Bowers v. National Collegiate Athletic

Ass'n, 475 F.3d 524, 546 (3d Cir. 2007); Fitchik v. New Jersey Transit Rail Operations, Inc., 873

F.2d 655, 659 (3d Cir. 1989).  This Court has previously held that sub-units of the New Jersey

Department of Law and Public Safety, such as the Division of Consumer Affairs and the Board

of Medical Examiners, are an arm of the state under this test. N.J. Stat. Ann. § 52:17B-5.6, 17B-

29; Longoria v. New Jersey, 168 F. Supp 2d 308, 315-16 (D.N.J. Oct. 17, 2001).  Here, this

Court finds that the Department of Law and Public Safety, the Division of Consumer Affairs, and

the Board of Medical Examiners are arms of the state for substantially the same reasons that the

court in <u>Longoria</u> found the New Jersey state police to be an arm of the state.  166 F. Supp 2d at

316.  As part of the executive branch of the government of New Jersey, these entities receive

their funding directly from the state or at the state's direction.[12]  <u>See, e.g.</u>, N.J. Stat. Ann. §

24:41-54(b) (directing New Jersey Legislature to appropriate monies from fund for the Division

of Consumer Affairs); § 45:9-22.17 (directing Board of Medical Examiners' use and transfer of

certain funds).  New Jersey law clearly places the Department of Law and Public Safety under the

aegis of the state, rather than treating it as an independent entity, and this would hold true for

divisions within the Department as well.  N.J. Stat. Ann. § 52:17B-1 and 2; 52:17B-5.6 through

5.9.  <u>See</u> <u>Kelley v. Edison Twp.</u>, No. 03-4817, 2006 WL 1084217, at *7 (D.N.J. Apr. 25, 2006)

(discussing attorney general and county prosecutors).  Furthermore, as departments (or divisions)

under the control and direction of the attorney general of the state, the Department of Law and

Public Safety, the Division of Consumer Affairs, and the Board of Medical Examiners are not

sufficiently autonomous for the state not to be the true party at interest in this matter.  <u>See</u>

<u>Simmerman v. Corino</u>, 804 F.Supp. 644, 650 (D.N.J. Oct. 23, 1992) (discussing agencies as arms

of the state).  Therefore, the Amended Complaint will be dismissed with prejudice as to the

Department of Law and Public Safety, the Division of Consumer Affairs, and the Board of

Medical Examiners under Eleventh Amendment immunity principles, and this Court need not

discuss the State Defendants' alternative, but more limited contention that these entities are not

"persons" within the purview of § 1983.  (State Def. Br. at 56.)

---

[12]The Court notes that these entities are sued only for equitable relief in Zahl's Amended
Complaint, but uses the full set of <u>Fitchik</u> factors in this analysis because the funding inquiry still
serves to determine the status of the entities.

To determine whether the official-capacity individual defendants in this matter may be sued by Zahl under the Ex parte Young doctrine, this Court utilizes "a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Verizon Md., Inc. v. Public Serv. Comm'n of Md., 535 U.S. 635, 645 (2002) (majority concurring as to Part III); Koslow v. Commonwealth of Pennsylvania, 302 F.3d 161, 178 (3d Cir. 2002). As this Court has failed to find jurisdiction as to Count Two of Zahl's Amended Complaint, this discussion will be limited to whether or not the declaratory judgment Zahl requests under Count One satisfies the "straightforward inquiry" test.

Declaratory judgments do not fall under the prohibition of retrospective monetary relief within the Ex parte Young doctrine. Verizon Md., Inc., 535 U.S. at 646; Bell Atlantic-Pennsylvania, Inc. v. Pennsylvania Public Utility Comm'n, 295 F. Supp 2d 529, 541 (D.N.J. Dec. 12, 2003). Therefore, the test as applied in this case collapses into an examination of whether Zahl has alleged an ongoing violation of federal law. Although this Court found, supra, that Zahl may not bring his equal protection claims as alleged in Count One in the present action, his claim in that count does include any illegal action by any defendant, and he does allege violations of federal RICO in his Amended Complaint. (Am. Compl. at ¶ 240(1).) This Court, therefore, finds that Zahl satisfies the "straightforward inquiry" test with regard to the official-capacity individual state defendants and will not entirely dismiss Count One as to the official-capacity state defendants on that basis.

The State Defendants alternatively argue that the official-capacity State Defendants are not "persons" within the scope of § 1983, and any such claims must be dismissed as to those defendants. (State Def. Br. at 56.) The State Defendants are correct as to the proposition that

state officials sued in their official capacity under § 1983 are no different from the state, and are thus not "persons" under that statute.  Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989); Blanciak v. Allegheny Ludlum Corp., 77 F.3d 690, 697 (3d Cir. 1996).  Zahl clarifies in his opposition papers that the official capacity State Defendants are sued only inasmuch as Zahl requests prospective injunctive, not monetary relief under § 1983.  So limited, Zahl's claims are within the definition of "person" in § 1983, and this Court denies the State Defendants' motion to dismiss as to the official-capacity State Defendants on this ground.  Will, 491 U.S. at 71 n.10.

**F.     Absolute Immunity**

Harper argues that he is entitled to absolute prosecutorial immunity from the claims brought by Zahl, as all of the conduct alleged concerning him within the Amended Complaint falls within the judicial and quasi-judicial spheres of action where a prosecutor is entitled to such immunity.  (State Def. Br. at 35-41.)  Zahl concedes that prosecutors are immune from suit when acting in a judicial capacity, but claims that Harper was acting in an investigatory capacity, and outside the protection of absolute immunity, during much of his involvement in the Zahl matters. (Pl. Opp. Br. to State Def. Br. at 30, 32.)

Zahl relies on Buckley v. Fitzsimmons, 509 U.S. 259 (1993), to vitiate any claim of absolute immunity by Harper.  In Buckley an indicted defendant, against whom the charges were later dropped, sued a variety of parties involved with the investigation and trial of the crime he was convicted of under 42 U.S.C. § 1983, including the prosecutors responsible for his case.  509 U.S. at 261-64.  The sole issues presented in Buckley were whether the prosecutors were entitled to absolute immunity for their conduct in obtaining an expert opinion on a boot print and holding

a press conference.  Id. at 272, 276.  The Court found that absolute prosecutorial immunity did

not attach functionally to the fabrication of false evidence during the investigatory phase of a

criminal proceeding prior to an indictment, and that statements to the press were not part of the

traditional immunity of the prosecutor or protected by a prosecutor's judicial function.  Id. at 276,

277.  The Court emphasized, however, that the traditional zones of absolute prosecutorial

immunity still remained when a prosecutor was preparing for and trying a case before a judicial

body: "We have not retreated, however, from the principle that acts undertaken by a prosecutor in

preparing for the initiation of judicial proceedings or for trial, and which occur in the course of

his role as an advocate for the State, are entitled to the protections of absolute immunity."  Id. at

273.  The functional approach to absolute immunity employed in Buckley applies to officials,

like Harper, advocating for the state in administrative proceedings.  See Light v. Haws, 472 F.3d

74, 79 (3d Cir. 2007) ("[W]e hold that those officials who are responsible for the decision to

initiate or continue a proceeding subject to agency adjudication are entitled to absolute immunity

from damages liability for their parts in that decision.").

        Sifting Zahl's Amended Complaint to arrive at the distinction between conduct eligible

for absolute immunity as consistent with the judicial function as a prosecutor and administrative

or investigatory conduct for which the doctrine of qualified immunity would provide the

appropriate analysis, pages 32 through 45 detail conduct by Harper allegedly violative of Zahl's

constitutional rights,[13] and pages 46 through 107 allege illegal conduct by other Defendants,

_____

        [13]Although the Court has already found that Zahl's constitutional claims are barred by
claim preclusion or the entire controversy doctrine, supra, the facts underpinning the
constitutional violations are incorporated into Zahl's conspiracy/RICO claims, and therefore
must be discussed.  (Am. Compl. at 73-74.)  Absolute immunity also merits discussion as an

including Harper.  Many of the allegations against Harper are for conduct squarely within the

traditional zone of prosecutorial absolute immunity, consisting of representations before judicial

bodies or filings before same.[14]  Yarris v. County of Delaware, 465 F.3d 129, 136 (3d Cir. 2006)

("Ultimately, whether a prosecutor is entitled to absolute immunity depends on whether she

establishes that she was functioning as the state's 'advocate' while engaging in the alleged

conduct that gives rise to the constitutional violation."); Giuffre v. Bissel, 31 F.3d 1241, 1251

(3d Cir. 1994).  This Court finds that Harper's "withholding exculpatory evidence" from the

various judicial bodies in Zahl I—Judge Klinger, the Board, the Appellate Division, and the New

Jersey Supreme Court was part of his advocacy role directly related to judicial proceedings, and

that absolute immunity attaches for Harper concerning such allegations in the Amended

Complaint in paragraphs 110(a-g), 134(10-11), 134(13), 135, 181, 190-91, and 196.[15]  See Carter

v. Burch, 34 F.3d 257, 263 (4th Cir. 1994).  Furthermore, Harper's moving for a "summary

decision" in the Zahl I administrative proceedings is clearly within Harper's judicial/advocacy

function for the state, and that absolute immunity is proper for Harper's conduct in seeking such

---

alternative ground for the dismissal of some of these claims.

[14]Zahl does not contest that absolute immunity attaches to RICO or state-law claims, and this Court finds that persuasive authority exists establishing such a proposition.  See Cullinan v. Abramson, 128 F.3d 301, 308 (6th Cir. 1997) (applying qualified immunity to RICO claim); Parette v. Virden, 173 F.App'x 534, 536 (8th Cir. 2006) (unreported) (applying absolute immunity analysis to RICO claim).

[15]The Court provides paragraph numbers for the allegations subject to absolute immunity merely for the convenience of itself and the parties, and not in an attempt to exhaustively list each paragraph in the Amended Complaint to which immunity attaches.  Such a task is, in any case, complicated by both the ubiquity of Harper in the Amended Complaint and the self-referential, nearly recursive nature of many allegations, uttered in general terms, tracking the required elements of the claims plead.  (See, e.g., Am. Compl. at ¶¶ 128-29.)

a resolution of the matter as alleged in paragraphs 110(c), 110(f), 110(k), and 110(n) of the Amended Complaint. Harper's use of Rubinfeld's and Blackman's testimony in Zahl I is, as part of the witness preparation for trial, also subject to absolute immunity in the instant matter, and to the extent the allegations of Amended Complaint paragraphs 110(h), 110(i), 110(n), 134(12), 181, 184-88, and 192-93 allege this conduct, such immunity applies. Buckley, 509 U.S. at 273. Zahl also makes various allegations regarding Harper's arguing before judicial bodies, urging interpretations of law to judicial bodies, conducting settlement negotiations, and exercising various procedural rights, such as issuing subpoenas and instituting actions. These allegations, for the most part, are subject to absolute immunity, including paragraphs 110(f, j, m, n, r), 134(1, 4, 6, 14-17), 135, 181, 183, 194, 197, 198, 205(2-3), 210(2), 222 (minus the June 30, 2003 letter announcing his retirement), and 235 of the Amended Complaint, with the following exceptions: Harper's attending a hearing, if he had no advocacy role at that hearing, is not within the scope of his absolute immunity (¶ 110(p)); Harper's billing practices after retirement, being administrative in nature, are not within the scope of his absolute immunity (¶ 110(r)); and Harper's statements to the press are not within the scope of his absolute immunity per Buckley. 509 U.S. at 276-78; Am Compl. at ¶ 110(s). See Ernst v. Child Youth Servs., 108 F.3d 486, 494 (3d Cir. 1997) (even malicious prosecution within absolute immunity). Similarly, this Court finds that absolute immunity would not be appropriate for Harper in acting, as alleged in paragraph 110(o) of the Amended Complaint, to encourage administrative and executive bodies other than those before which he represented the State of New Jersey to begin proceedings against Zahl. See Moran v. City of New Rochelle, 346 F. Supp 2d 507, 521 (S.D.N.Y. Nov. 16, 2004) ("Even to the extent that Nelson is entitled to immunity for the prosecution of summonses, she is not entitled to

absolute immunity for encouraging the issuance of summonses by others.").

Rubinfeld also claims absolute immunity from all allegations in the Amended Complaint based on his status as an expert witness in the Zahl I proceeding. Rubinfeld served as a witness during Zahl I's proceedings before the Board. (Rubinfeld Br., unpaginated.) Traditional, common-law absolute immunity applies to witnesses before judicial bodies, and Rubinfeld is therefore immune from Zahl's claims pertaining to his service as a witness in Zahl I. Brisoe v. LaHue, 460 U.S. 325 (1983); Hughes v. Long, 242 F.3d 121, 125 (3d Cir. 2001); Ernst, 108 F.3d at 494. Having found Rubinfeld to enjoy absolute immunity under common-law principles, this Court declines to examine whether or not he also enjoys immunity under N.J. Stat. Ann. § 45:9-19.11. (Rubinfeld Br., unpaginated.) Rubinfeld, however, is not immune from the activities alleged in Zahl's Amended Complaint for the any conduct not performed in connection with his witness function.

## G.  Qualified Immunity

Harper also claims that he is entitled to qualified immunity for his actions related to the administrative case against Zahl. The present posture of the case, however, is not conducive to an analysis of qualified immunity on the record before the Court. See Schrob v. Catterson, 948 F.2d 1402, 1421-22 (3d Cir. 1991) (deciding absolute immunity but finding record insufficient to determine qualified immunity issues). Although the parties have engaged in extensive briefing and filing, discovery has not proceeded sufficiently to determine the factual basis concerning many of Zahl's allegations. (Pl. Opp. Br. to State Def. Br. at 33.) Furthermore, the Court is convinced that the disposition of the instant motions to dismiss will narrow the factual issues

related to qualified immunity so as to make an examination of any remaining immunity issues proceed with greater clarity after discovery is completed in this case.  Therefore, the motion of the State Defendants to dismiss portions of the Amended Complaint on the grounds of qualified immunity are denied without prejudice to be submitted to the Court on a motion for summary judgment, at the appropriate time, should the issue of qualified immunity still exist.

## H.    Failure to State RICO Claims

In order to successfully plead a civil claim under 18 U.S.C. § 1964 ("RICO"), a plaintiff must allege that a person or persons conducted an enterprise through a pattern of racketeering activity or collection of unlawful debts proximately resulting in harm to the plaintiff's business or property interests.  18 U.S.C. § 1962(c); Maio v. Aetna, Inc., 221 F.3d 472, 483 (3d Cir. 2000) (setting forth RICO standing requirement); Leonard A. Feinberg, Inc. v. Central Asia Capital Corp., Ltd., 974 F.Supp. 822, 847 (E.D.Pa. May 1, 1997).  Defendants claim, inter alia, that Zahl's RICO claims fail the RICO continuity requirement; fail to comply with the applicable statute of limitations; fail to set forth a crime with sufficient specificity; cannot satisfy the requisite causation requirements; allege RICO aiding and abetting contrary to controlling caselaw; and do not sufficiently allege predicate acts or an enterprise. (State Def. Br. at 48-50; Rubinfeld Br. at Points II, IV; Kosovsky Br. at 10-11, 17, 22, 26, 36; Am. Compl. ¶¶ 260, 275.)

### 1.    RICO Aiding and Abetting

This Court finds that the argument of the Kosovsky defendants that the this Circuit does not recognize aiding and abetting claims under RICO is correct.  (Kosovsky Br. at 36.)  The Third Circuit has explicitly found that RICO does not permit aiding and abetting claims.

Pennsylvania Ass'n of Edwards Heirs v. Rightenour, 235 F.3d 839, 840 (3d Cir. 2000); Rolo v. City Investing Co. Liquidated Trust, 155 F.3d 644, 657 (3d Cir. 1998) overruled on other grounds, Rotella v. Wood, 528 U.S. 549 (2000). Zahl's aiding and abetting claims under Federal RICO are therefore dismissed with prejudice.

New Jersey courts, however, hold "the New Jersey RICO statute to be even broader in scope than the federal statute." State v. Ball, 632 A.2d 1222, 1240 (N.J. Super. Ct. App. Div. 1993) (hereinafter "Ball I"). This Court notes that a precedential opinion of the Appellate Division permits aiding and abetting theories under NJRICO. Franklin Medical Assocs. v. Newark Public Schools, 828 A.2d 966, 974 (N.J. Super. Ct. App. Div. 2003) ("Given these circumstances, we are satisfied that permitting Newark to assert aiding-and-abetting and NJRICO claims against Marucci in his individual capacity furthered, rather than offended, the interests of justice."); Bondi v. Citigroup, Inc., No. 10902-04, 2005 WL 975856, at *24 (N.J. Super. Ct. L. Div. Feb. 28, 2005). But see In re Tyco Int'l, Ltd., No. 02-1335, 2007 WL 1703023, at *22-23 (D.N.H. June 11, 2007) (following federal law in interpreting NJRICO not to include aiding and abetting liability). This Court, therefore, finds that Zahl's claim under Count 8 for NJRICO aiding and abetting is unaffected by the absence of a Federal RICO cause of action for aiding and abetting. (Am. Compl. ¶ 274.)

### 2.   RICO Enterprise

The Kosovsky Defendants argue that the Amended Complaint does not successfully plead a RICO enterprise under either Federal or New Jersey law. (Kosovsky Def. Br. at 22-23.) The Kosovskys urge this Court to find that the alleged enterprise, the Zahl Medical Practice Medical

Licensure Association-In-Fact Enterprise ("ZMPMLAIFE"), has no common purpose and no decision-making structure.  (Kosovsky Br. at 23-26.)  Plaintiff, however, argues that his Amended Complaint satisfies the requirements of Rule 8(a) with respect to pleading a RICO enterprise, that he has plead "that the various associates function[ed] as a continuing unit," and that he has plead the "superstructure or framework of the group."  In re Ins. Brokerage Antitrust Litig., No. 04-5184, 2007 WL 1062980, at *8 (D.N.J. Apr. 5, 2007); Pl. Reply to Kosovsky Br. at 20-21.

Plaintiff is correct that with respect to the enterprise element of his RICO claim he is subject to notice pleading standards under Rule 8(a).  Warden v. McLelland, 288 F.3d 105, 114 (3d Cir. 2002); In re Ins. Brokerage Antitrust Litig., 2007 WL 1062980, at *9 (collecting authorities and finding that only the portions of a complaint relevant to the fraud allegations themselves must meet the standard of Rule 9(b)).  Zahl must, however, present pleadings sufficient to put the defendants on notice of what they must defend against in this Court concerning the RICO enterprise, and those pleadings must possess sufficient factual specificity as to rise above mere speculation.  Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1964-65 (2007).  Generally, a Federal RICO enterprise requires pleading the following elements: evidence of an ongoing organization (formal or informal), that the members operate as a continuing unit, and that the enterprise exists separately from the activity alleged.  United States v. Turkette, 452 U.S. 576, 583 (1981); United States v. Riccobene, 709 F.2d 214, 221 (3d Cir. 1983), abrogation on other grounds recognized by United States v. Vastola, 989 F.2d 1318 (3d Cir. 1993).

Though the Kosovskys broaden their challenge to Zahl's enterprise pleadings in their Reply Brief to the enterprise's ongoing organization or its nature as a continuing unit, the crux of

the Kosovskys' argument concerning the ZMPMLAIFE's common purpose is that alleged

members had "mutually exclusive goals" inconsistent with the definition of an enterprise as laid

down by the Supreme Court in <u>United States v. Turkette</u>. 452 U.S. at 583; Kosovsky Reply Br. at

13. <u>Turquette</u> teaches that the elements listed <u>supra</u> are a means of satisfying the definition of a

RICO enterprise, but it does not follow that the definition provided by the Supreme Court is

without force and effect. 452 U.S. at 583; <u>United States v. Pelullo</u>, 964 F.2d 193, 211 (3d Cir.

1992). The <u>Turquette</u> definition of a RICO enterprise upon which the elements depend is: "The

enterprise is an entity, for present purposes a group of persons associated together for a common

purpose of engaging in a course of conduct." 452 U.S. at 583. Other courts have expanded upon

the common purpose requirement, emphasizing that some sort of structure or decision-making

apparatus must exist. <u>Bonner v. Henderson</u>, 147 F.3d 457, 460 (5th Cir. 1998) ("An association-

in-fact consists of personnel who share a common purpose and collectively form a decision-

making structure."); <u>Richmond v. Nationwide Cassel L.P.</u>, 52 F.3d 640, 645 (7th Cir. 1995)

(noting that structure is essential to an enterprise); <u>In re Ins. Brokerage Antitrust Litig.</u>, 2007 WL

1062980, at *7 ("Since an enterprise must have a common purpose, the enterprise must have at

least some fixed system of arrangement, as well as some continuity of personnel to effectuate that

purpose.").

     This Court finds that the ZMPMLAIFE fails to meet the definition of a RICO enterprise

in <u>Turquette</u>, and, specifically, that no common purpose to the enterprise is apparent from the

pleadings. <u>Id.</u> While the Court notes that a common thread in all of the submissions of the

parties and the extensive proceedings extant before other judicial bodies is that Zahl arouses

strong feelings, both positive and negative, in those he has personal contact with, not even the

most generous reading of the Amended Complaint and the motion papers indicates that the various members of the ZMPMLAIFE had a common goal or that the ZMPMLAIFE possessed any overall structure.  According to Zahl, the ZMPMLAIFE ostensibly operated to maintain his medical practice.  (Am. Compl. at 90.)  At some point, various defendants infiltrated the ZMPMLAIFE to interfere with or obtain Zahl's rights in his medical license and practice.  (Am. Compl. at 90-91.)  While these statements are consistent within themselves in alleging a common purpose, they make little sense when compared to the remainder of the Amended Complaint.  Turquette defined a RICO enterprise as one with a common purpose.  452 U.S. at 583.  Zahl pleads that the Kosovskys' purpose was to gain an advantage in the New York divorce and custody proceedings; that McKeown was an agent of the Kosovskys; that Blackman and Rubinfeld sought to acquire Zahl's Ridgedale practice; that Harper sought to terminate his license for the benefit of the other conspirators; and that Brittle acquiesced in Harper's plans.  (Am. Compl. at 60, 64, 65, 72, 77, 80).  Even assuming arguendo that these disparate defendants possessed the same RICO enterprise common purpose, this Court does not find plausible the view that the Supreme Court of New Jersey or the entire staff of the New Jersey Attorney General's office shared a common purpose with residents of the state of New York (the Kosovskys) or a private medical practice (Ridgedale), all entities alleged to be part of the ZMPMLAIFE.  (Am. Compl. at 91-92.)

Zahl maintains that his detailed pleadings satisfy the requirements of Turquette, reading that case as defining common purpose within the aggregate structure of the enterprise.  (Pl. Reply to Kosovsky Br. at 22.)  Such an expansive reading, applied to the instant matter, would effectively read the phrase "common purpose" out of the Turquette opinion.  This Court recently

found that the

> structure aspect cannot be satisfied by plaintiff's paraphrasing of plaintiff's allegations with respect to the pattern of the underlying racketeering activity, since permitting proof of the enterprise to be inferred from the pattern of racketeering activity would essentially make a circular argument allowing every pattern of racketeering activity to become an enterprise whose affairs are conducted through the pattern of racketeering.

In re Ins. Brokerage Antitrust Litig., 2007 WL 1062980, at *12 (internal quotation omitted). Zahl's separate section of the Amended Complaint detailing the structure of the ZMPMLAIFE appears to be just such a circular argument.  In addition to merely repeating the enterprise requirement ("a consensual decision-making structure that was used to both encourage and affect its lawful and unlawful purposes") it simply restates what was alleged earlier, with the addition of the words "masterminds" and "grand plan." (Am. Compl. at 92-95.)  Such pleading is too conclusory to meet even the relaxed standards of notice pleading under Federal Rule of Civil Procedure 8(a).   Bell Atl. Corp., 127 S.Ct. at 1964-65.

Furthermore, this Court fails to find any non-conclusory basis in the Amended Complaint that would warrant a finding that Harper was engaged in the same enterprise as the Kosovskys because no structure or organization exists to link them.  With respect to the Kosovskys, McKeown, and Blackman, Zahl has made a minimal showing that most likely satisfies notice pleading.  He alleges specific relationships between the Kosovskys and both McKeown and Blackman, and provides examples of conduct by McKeown, from which an inference strong enough, at least at this stage, to defeat a motion to dismiss arises with respect to the existence of an enterprise between some or all of these individuals. (Am. Compl. at 60-64, 69.)  The situation

with respect to Harper, however, is different, and this Court finds that the ZMPMLAIFE as plead cannot survive a motion to dismiss based upon the Zahl claims that "Harper vindictively joined the scheme." (Am. Compl. at 74.)  The Amended Complaint fails to provide any support for even an inference of how this came about or any decision-making process conducted among or between the members of the ZMPMLAIFE.  While Zahl need not allege an enterprise with the date, place, or time specificity required by Federal Rule of Civil Procedure 9(b), such conclusory pleadings fail to provide Harper and the other Federal RICO defendants with sufficient notice of the enterprise element of RICO.  Bell Atl. Corp., 127 S.Ct. at 1964-65; In re Ins. Brokerage Antitrust Litig., 2007 WL 1062980, at *9.

The enterprise requirement under NJRICO requires a common purpose and an ascertainable structure "support[ing] the inference that the group engaged in carefully planned and highly coordinated criminal activity."   State v. Ball, 661 A.2d 251, 260-61 (N.J. 1995) (hereinafter "Ball II").  This Court finds that Zahl has not met his burden of pleading that the ZMPMLAIFE was composed of participants with a common purpose.  While NJRICO may require a lower showing of enterprise than Federal RICO, Ball I and Ball II retained the "common purpose" language in the definition of an NJRICO enterprise.  Ball I, 632 A.2d at 1240; Ball II, 661 A.2d at 261, 271-72.  Ball II stated that division of labor within a criminal enterprise was consistent with a common purpose, and that individual self-interests did not defeat a common purpose, but does not stand for the proposition that entities with different overall goals, such as Zahl, the State of New Jersey, and his in-laws residing in New York, could satisfy such a requirement.  661 A.2d at 271-72.  Additionally, however, this Court looks to federal law to interpret NJRICO where state law is silent.  Cetel v. Kirwan Fin. Group, Inc., 460 F.3d 494,

510 (3d Cir. 2006); Interchange State Bank v. Veglia, 668 A.2d 465, 472 (N.J. Super. App. Div. 1995) (noting that when New Jersey caselaw is silent, "parallel federal case law is an appropriate reference source to interpret the RICO statute"). The ZMPMLAIFE, therefore, both under Ball II and as detailed supra under the discussion of Federal RICO, does not consist of participants with a common purpose under NJRICO, nor has Zahl successfully plead a common purpose under Federal Rule of Civil Procedure Rule 8(a).

This Court, therefore, dismisses without prejudice Zahl's Federal RICO and NJRICO claims in Counts Six and Eight for failure to meet the requirements of Federal Rule of Civil Procedure 8(a) in pleading an enterprise. This Court also dismisses without prejudice the Federal RICO and NJRICO conspiracy claims under Counts Seven and Nine of the Amended Complaint, as both statutes require an underlying racketeering offense to support a conspiracy. 18 U.S.C. § 1962(d); N.J. Stat. Ann. § 2C:41-2(d). Given that this Court has dismissed the Federal RICO and NJRICO claims in their entirety, it is not necessary to discuss the remainder of Defendants' arguments related to these claims.

## I.      Failure to State a Civil Conspiracy Claim

The State Defendants, Rubinfeld, and the Kosovsky Defendants all move to dismiss Count Ten of the Amended Complaint on the basis that it fails to state a civil conspiracy claim. (State Def. Br. at 57-58; Rubinfeld Br., unpaginated; Kosovsky Br. at 35.) The State Defendants maintain that the civil conspiracy count must be dismissed against the State Defendants due to Zahl's failure to file a notice of claim under the New Jersey Tort Claims Act, and all of the Defendants' briefs argue that Count Ten must be dismissed because it fails to allege a civil

conspiracy because a New Jersey civil conspiracy cannot be plead solely based upon another conspiracy.  (Id.)  Zahl responds by stating that a non-conspiracy RICO claim can support a civil conspiracy claim and that he is excused from complying with the Tort Claims Act with respect to his individual-capacity claims against Harper.  (Pl. Reply Br. to State Def. Br. at 54-55.)

Rubinfeld argues that he is only named as a defendant in the Amended Complaint as to the civil RICO conspiracy counts and the civil conspiracy count, and that a RICO conspiracy cannot serve as the predicate for a civil conspiracy claim, thus barring Count Ten against Rubinfeld.  (Rubinfeld Br., unpaginated.)  Zahl does not dispute that under New Jersey law, a civil conspiracy requires an independently actionable claim for support.  Eli Lilly and Co. v. Roussel Corp., 23 F. Supp 2d 460, 497 (D.N.J. July 7, 1998) (construing New Jersey caselaw on civil conspiracy); Pl. Reply Br. to State Def. Br. at 54.  As this Court has already dismissed the RICO counts against Rubinfeld without prejudice the common-law civil conspiracy claim is also dismissed as to him, without prejudice.[16]  This logic, applies equally to the remainder of the defendants, as all of the non-conspiracy RICO claims have also been dismissed without prejudice, and Zahl does not argue that any other claim in the Amended Complaint supports Count Ten, conceding that the civil conspiracy alleged therein relies on his RICO pleadings.  (Pl. Reply Br. to State Def. Br. at 54.)  This Court, therefore, dismisses Count Ten without prejudice as to all defendants, and need not reach the alternative arguments for dismissal by the moving Defendants.

---

[16]While the parties dispute whether Rubinfeld was a party to all four RICO claims or just a party to the RICO conspiracy claims, that issue is not properly before this Court because all of the RICO claims were dismissed supra.

**J.      Failure to State a Claim Under 42 U.S.C. § 1985(3) and 1986**

The State Defendants and the Kosovsky Defendants argue that Zahl's Amended

Complaint pleads his § 1985(3) claim based on discrimination against an impermissible "class of

one" and that this causes his claim to necessarily fail as a matter of law.  (State Def. Br. at 54-55;

Kosovsky Br. at 36.)  Zahl on the other hand, contends that he has successfully plead, and intends

to demonstrate at trial, that "defendants' actions were predicated upon" invidious discriminatory

animus related to his Dominican and Jewish ancestry.  (Pl. Opp. Br. to State Def. Br. at 51-52.)

The recent Third Circuit case of <u>Farber v. City of Paterson</u>, 440 F.3d 131 (3d Cir. 2006),

discusses the elements of a § 1985(3) civil rights claim.  Defendants do not claim that Zahl has

not plead any required elements but for the "class-based invidiously discriminatory animus."

(State Def. Br. at 54-55.)  The <u>Farber</u> court defined that element in this way:

> There are two distinct aspects to the 'class-based invidiously
> discriminatory animus' which, we now know, will support a §
> 1985(3) claim-the first is defined by form, and the second by
> function. Thus, a plaintiff must allege both that the conspiracy was
> motivated by discriminatory animus against an identifiable class
> and that the discrimination against the identifiable class was
> invidious.

<u>Farber</u>, 440 F.3d at 135.

Although Zahl identifies an incorrect pleading standard in his brief, this Court finds that

he has successfully alleged theories of law and supplied a bare minimum of facts for his §

1985(3) claim to survive a motion to dismiss, as his Dominican heritage figures significantly into

some of his allegations.[17]  Bell Atl. Corp., 127 S.Ct. at 1964-65 (abrogating "no set of facts"

language as reference for Rule 8(a) pleading standard); Farber, 440 F.3d at 135-36.  Specifically,

he alleges that Harper mentioned it with respect to negotiating a possible suspension of his

license in Zahl I.  (Am. Compl. at 6, 11, 30, 76-77).  While this allegation barely suffices at this

stage, it nevertheless provides the requisite factual basis for the Amended Complaint to survive

at the motion to dismiss stage relative to demonstrating a potential motive and invidiousness of

the class-based discrimination required, because it provides notice to the opposing parties of the

conduct they must be prepared to defend.  Farber, 440 F.3d at 135-36.  See also Bell Atl. Corp.,

127 S.Ct. at 1964-65; Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 274 (1993)

(further defining invidiousness under § 1985(3)).  Furthermore, Zahl's claims regarded to his

Dominican ancestry suffice to move him beyond the "class of one" characterization of

Defendants at the motion to dismiss stage.  (State Def. Br. at 54.)  This Court, therefore, denies

Defendants' motions to dismiss the § 1985(3) claims; and as the Defendants' arguments for

dismissal of the § 1986 claims rely on dismissal of the § 1985(3) claims, their motions to dismiss

are similarly denied with respect to those claims.

**K.       The Individual-Capacity Claims Against Defendant Stuart Rabner**

The State Defendants urge dismissal of the § 1983, § 1985(3), and § 1986 claims against

Chief Justice Rabner in his individual capacity,[18] as the Amended Complaint does not allege his

---

[17]While this Court found, supra, that Harper is entitled to absolute immunity for his statements made in attempting to settle the Zahl I matter, such functional immunity would not attach to any potential co-conspirators.

[18]Stuart Rabner was at the relevant time set forth in the Amended Complaint the Attorney General of the State of New Jersey, and is presently the Chief Justice of the New Jersey Supreme

involvement.  "A defendant in a civil rights action must have personal involvement in the alleged

wrongs." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  See also Thomas v.

Independence Twp., 463 F.3d 285, 298 (3d Cir. 2006) (quoting Rode).  Zahl's opposition papers

to the motion to dismiss do not make an argument in rebuttal, and as this Court's review of

Zahl's Amended Complaint does not reveal any factual allegations concerning Chief Justice

Rabner's personal involvement, Zahl's claims with respect to Chief Justice Rabner are therefore

dismissed without prejudice.

**L.      Failure to Plead Causation**

The Kosovsky Defendants argue that Counts Four, Six, Seven, Eight, Nine, and Ten must

be dismissed against them as Zahl has not sufficiently, nor can sufficiently, plead causation.

(Kosovsky Br. at 17.)  Specifically, the Kosovsky's urge the Court to find that Zahl cannot satisfy

the causation requirements of RICO, NJRICO, 42 U.S.C. § 1985, or common law civil

conspiracy because the loss of his license was caused by the decision of independent tribunals or

Zahl's own conduct, and that the chain of causation was too attenuated for liability to attach to

the Kosovskys for these harms.  (Id. at 17-22.)  Zahl rebuts this argument by asserting that his

theory of causation "is that ALJ Klinger [in Zahl I] was indeed factually misled by the

cooperative effort of the Kosovskys and their co-conspirator DAG Harper."  (Pl. Opp. Br. to

Kosovsky Br. at 13.)  Zahl also asserts that because the harm he suffered was identical to the goal

of the Defendants, causation as plead in his Amended Complaint is not so attenuated as to fail on

a motion to dismiss.  (Id. at 15.)

---

Court.

Both RICO and NJRICO require that a plaintiff demonstrate causation.  Maio v. Aetna, Inc., 221 F.3d 472, 483 (3d Cir. 2000); Interchange State Bank v. Veglia, 668 A.2d 465, 473 (N.J. Super. App. Div. 1995) ("If a plaintiff is harmed only in an indirect way by the predicate acts, the plaintiff does not have standing to pursue a RICO claim.").  "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."  Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461, 1998 (2006).  In determining whether proximate cause exists for a RICO claim, the Third Circuit has looked to the factors it utilizes to examine proximate cause in antitrust actions, weighing:

> (1) the causal connection between defendant's wrongdoing and plaintiff's harm; (2) the specific intent of defendant to harm plaintiff; (3) the nature of plaintiff's alleged injury . . . (4) the directness or indirectness of the asserted injury; (5) whether the damages claim is . . . highly speculative; and (6) keeping the scope of complex antitrust trials within judicially manageable limits, i.e., avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.

Anderson v. Ayling, 396 F.3d 265, 270 (3d Cir. 2005) (internal quotations omitted and punctuation regularized).

"[T]o maintain an action for civil conspiracy, a plaintiff must also point to (1) an overt act of one or more of the conspirators in furtherance of the conspiracy; and (2) consequential damage to the rights of another, of which the overt act is the proximate cause."  Farris v. County of Camden, 61 F. Supp 2d 307, 330 (D.N.J. Aug. 20, 1999).   If proximate cause is a requirement of the underlying tort the civil rights conspiracy claim depends upon, the plaintiff will have to satisfy the proximate cause requirement.  See In re Orthopedic Bone Screw Prods. Liability

Litig., 193 F.3d 781, 789 (3d Cir. 1999); Curbison v. United States, No. 05-5280, 2006 WL

3544560, at *9 (D.N.J. Dec. 7, 2006).  With regard to the Kosovskys, the common law

conspiracy and civil rights conspiracy claims depend on RICO violations as the tort supporting

them, so Zahl must satisfy the RICO proximate cause requirement to maintain the Amended

Complaint.

　　　　Proximate cause in the RICO and NJRICO contexts requires that a plaintiff demonstrate a

direct relationship between the conduct of the defendant and the harm suffered; indirect causation

does not suffice.  Anza, 547 U.S. at 461-62, 1998.  At this point in the proceedings, Zahl has

failed to demonstrate that any harms he has suffered, either from the loss of his medical license

in Zahl I, or from the loss of his medical practice, flowed directly from any actions of the

Kosovskys.  Even if Zahl were to establish during discovery that the Kosovskys formulated and

executed a plan to have the Board revoke his medical license and Ridgedale deny him the

renewal of his contract, those harms occurred directly through the actions of those intermediaries.

Ridgedale chose Rubinfeld to succeed Zahl; the Board revoked his license.  Even if these two

organizations acted on information supplied with malicious intent by the Kosovskys, the harm to

Zahl was too remote, "indirect" in the language of Anza, for him to succeed in satisfying RICO

or NJRICO proximate cause.  Id.  Furthermore, several of the Anderson factors weigh against a

finding of proximate cause in the instant matter.  396 F.3d at 270.  Specifically, the causal

connection Zahl invokes in his Amended Complaint between the Kosovskys and any harm he

suffered is consistently pleaded as being through other instrumentalities and individuals, such as

Harper, Blackman, the Board, or Ridgedale; the speculative nature of some of the damages

claims in his Amended Complaint, such as the loss of practice damages without having joined

Ridgedale as a party to this action; and the nature of Zahl's injuries as capable of recovery given the interposing acts of nonparties to this case, such as Ridgedale.

The parties disagree in their briefs over the applicability of one case in particular.  In Egervary v. Young, 366 F.3d 238 (3d Cir. 2004), the Third Circuit held that the act of an impartial intermediary, such as a charging prosecutor or grand jury, breaks the causal chain in a Bivens action if the impartial intermediary has been presented with "all of the facts."  Egervary, 366 F.3d at 247.  Zahl claims that the administrative process before the Board was factually deficient due to the many actions of Harper and the Kosovskys.  (Pl. Opp. Br. to Kosovsky Br. at 13-14.)  In his response, Zahl points to a specific portion of his Amended Complaint, and after review, this Court finds that the various misdeeds attributed therein to Harper do not demonstrate a problem with the extent of the information before the Board.  (Id. at 13; Am. Compl. at 35-40.) With respect to the allegations in that portion of the Amended Complaint relevant to the Board's decision or harm suffered by Zahl—withholding exculpatory evidence, Blackman's statements, the press release, and Harper's fees—none appear to relate to actions by the Kosovskys that the Board was unaware of that would make the harm suffered by Zahl more direct.  Furthermore, there is no allegation in that portion of the Amended Complaint relevant to the Kosovskys' influence on the decision of Ridgedale to utilize Rubinfeld curing the remoteness of that harm to Zahl.  Therefore, with respect to the Kosovskys, this Court finds that proximate cause is lacking due to the independent decisions of both the Board and Ridgedale, and that the RICO, §1985(3), and the § 1986 claim dependent upon the § 1985 claim must be dismissed without prejudice.

The Court does not, however, find that the decision of the Board and Ridgedale similarly insulates Rubinfeld and Harper (or the remaining State Defendants) from having proximately

caused any harm.  Notably, Zahl alleges that he was harmed by the press release and inflation of

Harper's fees, and by the submission to Ridgedale of information prejudicial to him by

Rubinfeld.  (Am. Compl. at 39-40, 65-66.)  Therefore the motion of the Kosovskys, to the extent

joined by Rubinfeld and the remaining State Defendants, is not be granted.  These matters should

instead proceed to discovery as limited by the other rulings on these motions.  (Korn Letter of

Dec. 5, 2007; Savage Letter of Dec. 10, 2007.)

## M.  Failure to Effect Service

The State Defendants move for dismissal of the Amended Complaint as to Harper for

failure to effect service within 120 days as provided by Federal Rule of Civil Procedure 4(m).

(State Def. Br. at 58-59.)  Zahl contends that Harper's wife accepted service of process for him

on July 12, 2007.  Fed. R. Civ. P. 4(e)(2); Pl. Cert. in Opp. to State Def. Br. Ex. 2; Docket # 44

(discussed in Ex. 2).  As any dismissal under Rule 4(m) could only be issued by this Court

without prejudice, the July 12, 2007, service upon Harper appears to conform with Rule 4(e)(2),

and the State Defendants do not argue in their Reply Brief that Harper has not now been served

(presumably with the Amended Complaint), the discretion left to this Court under Rule 4(m)—to

grant or not grant additional time for service—has been mooted.  This Court, therefore, denies

State Defendants' motion to dismiss under Rule 12(b)(5) with respect to Harper, this ruling does

not extend a determination as to what further effect the service alleged by Zahl on Harper may

have on this matter.

## N.  Statute of Limitations Issues

With regard to the remaining claims bv Defendants that the applicable statute of

limitations bars Zahl's claims, this Court finds that without a developed factual record the issue

cannot be decided from the face of the complaint alone.  Therefore a more complete record is

required to determine issues such as accrual dates and any continuing actions that would warrant

extending or tolling the limitations period.  (State Def. Br. at 50-54; Rubinfeld Br., unpaginated;

Kosovsky Br. at 10-17.)  "[T]he law of this Circuit (the so-called 'Third Circuit Rule') permits a

limitations defense to be raised by a motion under Rule 12(b)(6), but only if the time alleged in

the statement of a claim shows that the cause of action has not been brought within the statute of

limitations." Robinson v. Johnson, 313 F.3d 128, 135 (3d Cir. 2002) (internal quotation omitted).

Despite the multiplicity recited in the Amended Complaint of dates and the long-term nature of

some of the conduct alleged, the factual complexity of Zahl's Amended Complaint and the

sometimes intricate theories of liability upon which it relies, this Court cannot dismiss at this

time based on statutes of limitations.  However, the parties may renew these arguments when the

record is more fully developed at the summary judgment stage.  See Worldcom, Inc. v. Graphnet,

Inc., 343 F.3d 651, 657-58 (3d Cir. 2003).

## CONCLUSION

For the foregoing reasons and as set forth in the accompanying order, Defendants'

motions to dismiss the Amended Complaint are hereby granted in part and denied in part.  An

appropriate order accompanies this Opinion.


DATED: March 25, 2008                                         _/s/ Jose L. Linares_____

                                                              United States District Judge


-62-